# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA DEPARTMENT OF WATER
RESOURCES,
                    *Petitioner,*

          v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent.*

No. 04-76131

FERC No.
ER99-2326

OPINION

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
January 8, 2007—San Francisco, California

Filed June 7, 2007

Before: Procter Hug, Jr., A. Wallace Tashima, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Tashima

**COUNSEL**

Deborah L. Barnes, Deputy Attorney General, Sacramento, California, for the petitioner.

Carol J. Banta, Office of General Counsel, Federal Energy Regulatory Commission, Washington, DC, for the respondent.

Mark D. Patrizio, San Francisco, California, for respondent-intervenor Pacific Gas and Electric Company.

Jennifer L. Key, Steptoe & Johnson, Washington, DC, for respondent-intervenor Southern California Edison Company.

Michael E. Ward, Alston & Bird, Washington, DC, and Charles F. Robinson, Folsom, California, for respondent-intervenor California Independent System Operator Corporation.

---

## OPINION

TASHIMA, Circuit Judge:

The California Department of Water Resources ("DWR") petitions for review of a Federal Energy Regulatory Commission ("FERC") order permitting intervenor Pacific Gas and Electric Company ("PG&E") to include in its tariff for use of PG&E power transmission lines charges for $132 million worth of various facilities previously classified as generation tie lines and generation step-up transformers ("GSUs").[1] PG&E, a utility which owns the high-voltage electricity transmission lines in California, is required to allow anyone to transmit power over these lines. PG&E may recover costs associated with transmission by charging users a tariff, subject to FERC approval. FERC determined that, because all of the facilities at issue perform some transmission function,

---

[1]DWR is the state agency responsible for the control and management of much of California's water supply. DWR is considered a third-party generator, as it produces electricity at hydroelectric and coal plants and then transfers this electricity to its pumping stations using transmission service purchased from PG&E and other providers. DWR also sells energy. In 2003, it sold 1.00 million MWh of energy to utilities and power marketers on energy wholesale markets, transmitted through PG&E facilities. According to DWR, it uses its own generation step-up transformers and generation tie lines, all of which it pays for itself.

PG&E could include their cost in its tariff and roll in the facilities' costs equally to all transmission users. We have jurisdiction pursuant to 16 U.S.C. § 825*l*(b) over this petition for review of an order issued by FERC. We deny DWR's petition for review because its various claims of error are unfounded. FERC's decision to categorize the facilities as "transmission" based on an exclusive use test and to roll in their costs does not conflict with FERC precedent and is a reasonable approach to allocate the cost of facilities whose operation benefits all grid users. We also hold that FERC's decision was supported by substantial evidence and that DWR was not deprived of any due process rights by the allowance of a particular witness's testimony.

## I.  BACKGROUND

### A.  Statutory and Regulatory Background

The Federal Power Act ("FPA"), Pub. L. No. 66-280, 41 Stat. 1063 (codified as amended in scattered sections of 16 U.S.C.), provides that a utility may not charge rates that "make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage." 16 U.S.C. § 824d(b). Similarly, under § 205(a) of the FPA, a utility may charge only rates that are "just and reasonable." Pub. L. No. 74-333, 49 Stat. 803, 851 (codified as amended in 16 U.S.C. § 824d(a)). Utilities must submit their rate schedules to FERC for review and approval. 16 U.S.C. § 824d(c)-(e).

Historically, electric utilities operated as vertically integrated monopolies. *New York v. FERC*, 535 U.S. 1, 5 (2002). One utility offered a "bundled" service, whereby customers paid a single price for generation, transmission, and distribution of electricity. *Id.* "Competition among utilities was not prevalent." *Id.* Although the number of power suppliers has increased dramatically since the advent of federal regulation in the 1930s, until recently, public utilities continued to retain

control of the transmission lines that must be used for electricity delivery. *Id.* at 7-12.

After determining that utilities were discriminatorily denying competitor power suppliers access to utilities' electricity transmission lines, FERC, in 1996, issued Order No. 888. Order No. 888, *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, F.E.R.C. Stats. & Regs. ¶ 31,036, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996) (codified as revised at 18 C.F.R. pts. 35, 385).[2] The Order required public utilities that own, control, or operate transmission facilities to file open access tariffs under which they agree to provide non-discriminatory access to their transmission networks in addition to the point-to-point service the utilities had been offering. *Id.*; *see also New York*, 535 U.S. at 11-12. The Order also required utilities to "functionally unbundle" their rates by separately stating rates for generation, transmission, and ancillary services. Order No. 888, 61 Fed. Reg. at 21,552; *see also New York*, 535 U.S. at 11.

## B.   Procedural History

On November 26, 1996, FERC authorized the formation of the California Independent System Operator Corporation ("California ISO" or "ISO") to operationalize Order No. 888 in the state. *See Pac. Gas & Elec. Co.*, 77 F.E.R.C. ¶ 61,204 (1996) (as amended). The order also conditionally granted

---

[2]For the revisions and clarifications of Order No. 888, *see New England Power Co.*, 76 F.E.R.C. ¶ 61,009 (1996) (Order No. 888), 76 F.E.R.C. ¶ 61,347 (1996), and 79 F.E.R.C. ¶ 61,182 (1997), *on reh'g*, F.E.R.C. Stats. & Regs. ¶ 31,048, 62 Fed. Reg. 12,274 (Mar. 14, 1997), (Order No. 888-A) *on reh'g*, 81 F.E.R.C. ¶ 61,248, 62 Fed. Reg. 64,688 (Nov. 15, 1997) (Order No. 888-B), *on reh'g*, 82 F.E.R.C. ¶ 61,046 (1998) (Order No. 888-C), *aff'd in relevant part*, *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

joint applications by PG&E, San Diego Gas & Electric Company, and Southern California Edison Company (collectively the "Companies") to categorize certain assets as "transmission," and to convey operational control of any "transmission" facilities to the ISO.[3] *Id.* at 61,795-96, 61,822; *see Pac. Gas & Elec. Co.*, 81 F.E.R.C. ¶ 61,122, 61,435 (1997) (conditionally authorizing transfer of certain of the Companies' transmission facilities to the ISO), *aff'd*, 82 F.E.R.C. ¶ 61,223 (1998).

The 1996 order further required PG&E and the other companies to submit tariffs, known as "Transmission Owner Tariffs" or "Transmission Revenue Requirements," designed to recoup the revenue that they, as the owners of the facilities, turned over to ISO control. 77 F.E.R.C. ¶ 61,204, at 61,798-800, 61,826-27.

In March 1999, PG&E filed a Transmission Owner Tariff, which purported to establish charges for transmission service provided under the California ISO open access tariff. *Pac. Gas & Elec. Co.*, 87 F.E.R.C. ¶ 61,218, 61,859 (1999). In May 1999, FERC accepted the proposed tariffs for filing. *Id.* at 61,861. It suspended and set for a hearing proposed revisions to the rates, terms, and conditions for transmission service under PG&E's tariff. *Id.* The purpose of the hearing was to determine whether the proposed rates were unjust and unreasonable. *See id.* FERC initiated an investigation under

---

[3]As originally conceived, the ISO was formed as a non-profit corporation that would operate, but would not own, the transmission grid. 77 F.E.R.C. ¶ 61,204, at 61,795-98. As an organization independent of the utilities, the ISO schedules power delivery, controls and manages the grid's operation, and collects a transmission access charge from those who withdraw power from the grid, remitting the revenue to the transmission line owners (such as PG&E). *Id.* at 61,798-99. Since the time of the 1996 order, changes not relevant to this proceeding have been made to the ISO's responsibilities in light of California's 2001 energy crisis. *See generally Pub. Utils. Comm'n v. FERC*, 462 F.3d 1027, 1041-43 (9th Cir. 2006) (as amended).

§ 206 of the Federal Power Act, Pub. L. No. 74-333, 49 Stat. 803, 852 (codified as amended at 16 U.S.C. § 824e), and established a refund effective date. *Id.* at 61,859. The parties subsequently filed partial settlements, approved by FERC, resolving all but two issues related to the filing. *Pac. Gas & Elec. Co.*, 90 F.E.R.C. ¶ 61,093, 61,303 (2000); *Pac. Gas & Elec. Co.*, 91 F.E.R.C. ¶ 61,090, 61,318 (2000).[4]

After the hearing, the presiding judge issued an initial decision which rejected in large part PG&E's request to include the facilities in its Transmission Revenue Requirement. *Pac. Gas & Elec. Co.*, 97 F.E.R.C. ¶ 63,014, 63,061-62 (2001). The judge excluded from the Transmission Revenue Requirement all facilities that performed both network transmission and generation tie functions. He found that $26 million worth of facilities were dedicated entirely to network transmission, and could be recovered by PG&E. *Id.* at 63,062.

In Opinion No. 466, FERC reversed the initial decision. *Pac. Gas & Elec. Co.*, 104 F.E.R.C. ¶ 61,226 (2003). FERC held that the proper test to determine which facilities were to be included in PG&E's Transmission Revenue Requirement was whether the facilities had been transferred to the control of the ISO. *Id.* at 61,790. If they had, then the facilities would be included in the rate base; otherwise they would be excluded.[5] *Id.*

In Opinion No. 466-A, FERC granted rehearing. *Pac. Gas & Elec. Co.*, 106 F.E.R.C. ¶ 61,144, 61,479 (2004). It found that ISO control, although necessary, was not the only consid-

---

[4]PG&E subsequently made another filing, which was also settled. As a result, the rates at issue in this proceeding were effective for only ten months, from the disputed tariff's effective date (May 31, 1999) until the effective date of PG&E's later-filed tariff (April 1, 2000).

[5]At the time, it was claimed that PG&E had failed to turn over properly to ISO control the loop or transformer facilities at issue. However, the parties represented at oral argument before this court that PG&E has since submitted the proper filings to turn over control of the facilities.

eration in determining whether the facilities could be included in the Transmission Revenue Requirement. *Id.* at 61,480-82 & 61,482 n.44. Opinion No. 466-A nevertheless affirmed that the facilities should be included, because all of the facilities performed a transmission function and because FERC policy favored rolling in the costs of transmission facilities. *Id.* at 61,480-82.

FERC denied rehearing in Opinion No. 466-B, *Pac. Gas & Elec. Co.*, 108 F.E.R.C. ¶ 61,297, 62,508 (2004), and DWR petitioned this court for review.

## C.  Facilities

The facilities at issue were separated by the presiding judge into three groups. The characterization of the facilities was largely based on the testimony of PG&E witness Robert Jenkins.

### 1.  *Loop Facilities.*

Three 500 kV transmission lines comprise the Diablo Canyon Loop.[6] The lines connect the Diablo Canyon Nuclear Power Plant to the grid and also provide parallel transmission paths between two substations (Gates and Midway). Power flows from the Diablo Canyon Nuclear Power Plant onto the grid through the Diablo Loop. In addition, the Diablo Canyon Loop forms part of the 500kV system which runs through California on a separate corridor (a parallel path) to Path 15.[7]

---

[6]A looped circuit provides two sources of power to a load or a substation, so that if one is deenergized, the remaining source continues to provide power.

[7]Path 15, a network of high voltage transmission lines, has been described as follows:

> Path 15 is the principal means of transmitting electricity between [Northern and Southern California] and into the Pacific Northwest. Energy produced in Southern California comes mainly

According to Jenkins, if the parallel path were not there, transfers along Path 15 would have to be reduced by as much as 25 percent.

The Morro Bay Loop consists of six 230 kV lines that run through the Los Padres area of the PG&E electric transmission system. The Loop connects the Morro Bay Power Plant to the grid. The Loop also provides parallel paths to the Diablo Canyon Loop and to Path 15. Finally, according to Jenkins, the Loop serves to deliver "load," the electrical power required at a specific point, to the local area. During periods of high local generation, excess power is delivered via the Loop into the rest of the system. During periods of low or no generation, the Loop imports power into the area to serve the local load.

The Moss Landing Loop consists of 500 kV transmission lines, connecting the Moss Landing Power Plant and a Moss Landing transformer to the grid. The Loop connects to the Metcalf substation, and is one of two 500 kV transmission lines feeding that substation. The Metcalf substation serves load to the local area. According to Jenkins, if not for the support of the Moss Landing Loop, the load in the Central Coast area would need to be curtailed and large portions of southern Silicon Valley would experience an endangered power supply, as the subsequent loss of the other 500 kV transmission

---

from natural gas-fired generators; in Northern California and the Pacific Northwest, hydroelectric generation predominates. In the winter, energy typically flows from south to north. Summer flows are in the opposite direction. The movement of power along Path 15 is often constrained because of its lack of capacity to handle the transmission of power in the summer and winter months.

*Pub. Utils. Comm'n v. FERC*, 367 F.3d 925, 927 (D.C. Cir. 2004). In Opinion No. 466-A, FERC took notice of the fact that the Morro Bay and Moss Landing Loops formed a parallel path to Path 15. 106 F.E.R.C. ¶ 61,144, at 61,481.

line that feeds the Metcalf substation would result in the interruption of "hundreds to thousands" of megawatts of load.

### 2. *Dual Function Facilities*.

Several transformer banks, collectively worth approximately $17 million, were classified as "dual function" by PG&E. These transformers are located at PG&E plants. The transformers "step up" the voltage of power generated at the plant to make it compatible with the grid's voltage. The transformers are considered dual function because they also serve the grid, transforming power that passes through between various transmission-level voltages.

### 3. *Network-Only Facilities*.

Finally, $26 million worth of facilities were classified as transmission-only or network-only. These facilities consist of transformer banks and lines connecting network stations. The transformer banks are located at generating stations that have been decommissioned. The transformers operate only as interchange banks, transforming power passing through between various transmission-level voltages. Two 230 kV lines were previously connected to generators but have been reconfigured so that they now connect network stations.

## D.   Methods of Pricing Transmission Services

The two types of pricing structures at issue in this case are rolled-in pricing and subfunctionalized pricing. "When a utility uses the rolled-in allocation method for transmission costs, all customers share proportionately in the ownership, operation, and maintenance costs of all transmission facilities." *Sierra Pac. Power Co. v. FERC*, 793 F.2d 1086, 1088 (9th Cir. 1986). Rolled-in pricing of transmission facilities is the method traditionally used in the industry. *See Pac. Gas & Elec. Co.*, 53 F.E.R.C. ¶ 61,146, at 61,521 (1990) (Opinion No. 356).

In 1978, PG&E developed a "subfunctional" pricing method for its wholesale transmission rates. *Id.* at 16,520. Subfunctional allocation was implemented in response to the complaint of a transmission-only customer that it should not have to pay PG&E's "fully allocated" transmission rates because those rates included the cost of PG&E's generation tie lines, which the customer did not use. According to the PG&E employee who developed the rate methodology, PG&E "develop[ed] the subfunctionalized transmission rate method in order to more accurately track the costs of customers."

PG&E studied its transmission facilities and assigned each facility a subcategory based on the facility's function within the transmission category. "Transmission" referred to line and substation facilities with nominal operating voltages of at least 50 kV. The five subcategories or "subfunctions" are: (1) backbone; (2) generation tie; (3) system interconnection; (4) exclusive use; and (5) area transmission. *See id.* at 61,520-21 (describing the subfunctions). Customers were charged "postage stamp" rates for each subfunction utilized, meaning the rate was set without regard to the distance the power traveled. *See id.* at 61,521 (giving examples of transmission rates broken out by subfunction).

Generation ties were defined as transmission facilities with the primary purpose of providing electrical paths between generating facilities and the integrated transmission network. *Id.* at 61,520 n.65. Under the subfunctionalized method, the loops and transformers in this case were classified as generation tie.

## II. ANALYSIS

### A. Standards of Review

We must uphold FERC orders unless they are "arbitrary, capricious, an abuse of discretion, unsupported by substantial

evidence, or not in accordance with the law." *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 910 (9th Cir. 2003); *see* 5 U.S.C. § 706(2)(A). If the record "reflects that the decision was based on a consideration of relevant factors, and there was no clear error of judgment," FERC's decision is not arbitrary and capricious. *Cal. Dep't of Water Res.*, 341 F.3d at 910 (internal quotation marks and citation omitted). FERC must provide a coherent and adequate explanation of its decisions. *See E. Tex. Elec. Coop., Inc. v. FERC*, 331 F.3d 131, 136 (D.C. Cir. 2003).

Deference is owed to FERC's interpretation of its own regulations, unless plainly erroneous. *See Friends of the Cowlitz v. FERC*, 253 F.3d 1161, 1166 (9th Cir. 2001), *amended by* 282 F.3d 609 (9th Cir. 2002). Deference is also owed to FERC's interpretation of the FPA, the law it is charged with administering. *See Cal. Trout, Inc. v. FERC*, 313 F.3d 1131, 1133-34 (9th Cir. 2002) (noting *Chevron* deference). Similarly, it is appropriate to give deference to FERC's interpretations of its own orders. *See Mid-Continent Area Power Pool v. FERC*, 305 F.3d 780, 783 (8th Cir. 2002) (citing *Minn. Power & Light Co. v. FERC*, 852 F.2d 1070, 1072 (8th Cir. 1988)).

When an agency has adopted a general policy, "an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion.' " *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (citing 5 U.S.C. § 706(2)(A)) (alteration in the original). Finally, FERC's factual findings are conclusive if the findings are supported by substantial evidence. *See* 16 U.S.C. § 825*l*(b).

## B.   Adoption of Rolled-In Pricing Was Proper

In this § 205 case, FERC was obliged to determine whether PG&E's proposed method of pricing was just and reasonable. FERC's order upholding the proposal was neither arbitrary

nor capricious. FERC classified the facilities as "transmission" and rolled in their costs after considering the facilities' functions and the methodology utilized in previous adjudications involving transmission tariffs.

    *1.   FERC Permissibly Classified the Facilities as "Transmission" Because They Performed Some Transmission Function.*

FERC classified all of the facilities at issue as "transmission" despite the fact that the bulk of the facilities serve generation functions in addition to transmission functions. Specifically, the loops connect plants to the grid, and many of the transformer banks step up the voltage of generated power to make the voltage compatible with grid levels. According to Opinion No. 466-B, "any degree of integration is sufficient to establish that the costs of the facilities should be treated as transmission." 108 F.E.R.C. ¶ 61,297, at 62,511. The presiding judge called this benchmark the "exclusive use" test because it classified facilities as "generation" for costing purposes (*i.e.*, excluded from rolled-in pricing) only if the facilities were used exclusively to generate power, step up power, or transmit power from the generator to the grid. He initially rejected this benchmark when it was proposed by PG&E because he believed that the "exclusive use" test unfairly conflated the transmission and generation functions.

**[1]** We hold that the exclusive use test comports with FERC's treatment of other facilities serving dual purposes. For example, in *American Electric Power Service Corp.*, 80 F.E.R.C. ¶ 63,006 (1997), *rev'd in part on other grounds*, Opinion No. 440, 88 F.E.R.C. ¶ 61,141 (1999), a utility sought to include in its transmission tariff the costs associated with two 765 kV lines which supported both generation and transmission functions. *Id.* at 65,057. The extra-high voltage lines connected an isolated generation facility with the rest of the grid, but their configuration also provided an east-west 765 kV link across the state of Indiana, providing back-up and

reliability functions to the grid. *Id.* The presiding judge found that the lines were properly included in the tariff. *Id.*; *see* Opinion No. 311, *Am. Elec. Power Serv. Corp.*, 44 F.E.R.C. ¶ 61,206, at 61,748 (1988) (noting in earlier proceeding that the same lines serve a transmission function); *Northeast Tex. Elec. Coop., Inc.*, 108 F.E.R.C. ¶ 61,084, at 61,426, 61,433 & n.66 (2004) Opinion No. 474) (classifying as "transmission" facilities that primarily served to connect and protect points of delivery, where the facilities also maintained reliability of service over the network transmission lines); *Otter Tail Power Co.*, 12 F.E.R.C. ¶ 61,169, 61,419-20 (1980) (Opinion No. 93). Thus, although FERC has never explicitly referred to an exclusive use test, it appears that it does apply such a test to determine whether facilities should be classified as "transmission."[8]

**[2]** Like the lines in *American Electric Power Service Corp.*, PG&E's loop facilities and dual function facilities serve a network transmission function in addition to benefitting PG&E's generation. For example, the Diablo Canyon and Morro Bay Loops both function as parallel paths to Path 15. In addition, the Morro Bay Loop carries over 540 MW of local area load. The Moss Landing Loop carries approximately 740 MW of local area load and is one of two 500 kV lines feeding a substation that serves Silicon Valley. Further, the transformer banks within the group of "dual function facilities" both transform power at the generating station (supporting PG&E generation) and transform power that passes through the banks between various levels of voltage (a transmission function).[9] Finally, the network-only facilities serve

---

[8]This test was applied both before and after Order No. 888 was adopted in 1996. *See, e.g.*, 80 F.E.R.C. ¶ 63,006, at 63,057; 12 F.E.R.C. ¶ 61,169, at 61,420. Although DWR emphasizes repeatedly that Order No. 888 required the unbundling of transmission and generation, it points to no specific directive in that Order or elsewhere that conflicts with FERC's method of classifying facilities.

[9]The GSUs in *Kentucky Utilities Co.*, 85 F.E.R.C. ¶ 61,274 (1998) (Opinion No. 432), are thus distinguishable from the transformer banks in

no generation function, only a transmission function, because the generators they previously supported have been decommissioned.

[3] The facilities were all shown to perform some transmission function. Consequently, FERC's *sub silentio* application of an exclusive use test in order to classify the facilities as "transmission" affords consistent treatment to regulated utilities across rate proceedings, and was not arbitrary or capricious.

### 2. *FERC Policy Consistently Favors Rolled-In Transmission Pricing.*

[4] FERC precedent clearly demonstrates a consistent policy favoring the rolled-in method of transmission pricing where the system operates as an integrated whole.[10] *Otter Tail Power Co.*, 12 F.E.R.C. ¶ 61,169 (1980) (Opinion No. 93), is an oft-cited example of this policy. In *Otter Tail*, FERC found that a utility properly attributed six high-voltage lines to a transmission function and that the utility should therefore allocate the costs of the lines on a rolled-in basis. *Id.* at 61,416-17. The owner of the lines, Otter Tail, was subject to an antitrust decree requiring Otter Tail to wheel[11] power from any third-party supplier to any municipality within Otter Tail's service area. *Id.* at 61,411. During a proceeding to

the instant case. As Order No. 466-A noted, the GSUs in *Kentucky Utilities* were "used solely to increase the voltage of electric energy produced by generators." 106 F.E.R.C. ¶ 61,144, at 61,481; *see* 85 F.E.R.C. ¶ 61,274, at 62,111 (citing *Northern States Power Co.*, 64 F.E.R.C. ¶ 61,324, 63,379 (1993), for unbundling requirements). Applying the exclusive use test, such facilities serve no independent transmission function at all and were appropriately separated from transmission pricing. Despite DWR's reliance on this case, we do not find any substantial support for DWR's argument in *Kentucky Utilities*.

[10]The parties appear to assume that PG&E's system is integrated.

[11]"Wheeling" refers to the use of transmission facilities of one system to transmit power for another system.

determine the rate Otter Tail could charge for wheeling power, Otter Tail introduced evidence that the six high-voltage lines were used for network transmission. *Id.* at 61,419-20.

Other parties to the proceeding contended that the lines should not be included in Otter Tail's transmission rate because the lines were of more use to Otter Tail in its production (power generation) function than in a transmission function. One group noted that some lines were built to intertie Otter Tail's plants with power sources. *Id.* at 61,417-18. It argued that on these lines, the use for transmitting non-Otter Tail-produced power was *de minimis*, such that the lines should be excluded from the rate base. *Id.* at 61,418. Another group introduced evidence that the lines performed production-related functions 26.3 percent of the time, and argued that a corresponding percentage of the lines' costs should be excluded from the rate base. *Id.* at 61,418 n.54.

FERC rejected these arguments, holding that any facility found to serve a transmission function was properly includable in the rate base. *Id.* at 61,423. As such, FERC found that the six lines' costs formed part of the transmission rate base, to be rolled-in to all customers. FERC noted that "Commission precedent strongly favors use of the rolled-in method of transmission allocation." *Id.* at 61,420 n.65 (citing *Ala. Power Co.*, 8 F.E.R.C. ¶ 61,083 (1979) (Opinion No. 54); *Public Serv. Co. of Ind.*, 57 F.P.C. 1173 (1977) (Opinion No. 783-A), *aff'd in part*, *rev'd in part*, *Public Serv. Co. of Ind. v. FERC*, 575 F.2d 1204 (7th Cir. 1978); *Fla. Power & Light Co.*, 56 F.P.C. 3581 (1976) (Opinion No. 784); *Detroit Edison Co.*, 54 F.P.C. 3012 (1975) (Opinion No. 748)). FERC explained:

> The principal reason behind adoption of this methodology is that an integrated system is designed to achieve maximum efficiency and reliability at a minimum cost on a systemwide basis. Implicit in this theory is the assumption that all customers, whether

they be wholesale, retail or wheeling customers, receive the benefits that are inherent in such an integrated system.

12 F.E.R.C. ¶ 61,169, at 61,420 (internal citations omitted). Because Otter Tail's system was integrated, a rolled-in allocation method was appropriate. *Id.*

**[5]** Under *Otter Tail*'s rationale, it is irrelevant whether the loops and transformer banks directly serve the power requirements of a third-party generator such as DWR. As long as the system is integrated, and the facilities are integrated with the system, DWR is assumed to benefit from the transmission these facilities provide.[12] *Accord Me. Pub. Serv. Co. v. FERC*, 964 F.2d 5, 8-9 (D.C. Cir. 1992); *cf. Me. Public Serv. Co.*, 85 F.E.R.C. ¶ 61,412, at 62,566-68 (1998) (Opinion No. 434) (determining that the cost of three low-voltage lines could not be included in transmission rates where the lines were not looped and could form no parallel paths with transmission facilities). Because DWR benefits from the integrated grid, FERC reasonably required it to pay its share of the cost.

### 3.   FERC Has Not Changed Its Policy Toward the Pricing of Transmission Facilities.

**[6]** DWR argues that FERC's policy regarding rolling in transmission costs "has been modified significantly" over the past decade, particularly in light of Order No. 888. In support,

---

[12]We note that FERC has applied analogous reasoning to proposals to roll in the costs of administering an ISO. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 97 F.E.R.C. ¶ 61,033 (2001) (Opinion No. 453) (as amended), *aff'd sub nom. Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361 (D.C. Cir. 2004). In Opinion No. 453, FERC affirmed that the ISO benefits all users of the grid it operates by increasing the grid's reliability. 97 F.E.R.C. ¶ 61,033, at 61,169. It rejected several utilities' arguments that they should not have to pay part of the administrative cost because they would not benefit, and held that the costs should be rolled into the transmission tariffs. *See id.*

DWR highlights various statements by FERC between 1994 and 2003 acknowledging alternative methods of transmission pricing, contained in the 1994 Transmission Pricing Policy Statement,[13] Order No. 888, Order No. 2000,[14] the 2002 Standard Market Design rulemaking proceedings[15] ("SMD NOPR"), and Orders No. 2003[16] and 2003-A. The presiding judge also believed Order No. 888's endorsement of unbundling forbade attribution of any generation costs to the transmission tariffs. We have reviewed the cited orders and policy statements, and we find no such change in policy.

[7] As discussed above, Order No. 888, issued in 1996, required each public utility to file tariffs for open access transmission services, with the goal of remedying undue discrimination in access to the utilities' monopoly-owned transmission wires. 61 Fed. Reg. at 21,541. FERC decisions

---

[13]*Inquiry Concerning the Commission's Pricing Policy for Transmission Services Provided by Public Utilities Under the Federal Power Act; Policy Statement*, [Regs. Preambles 1991-1996] III F.E.R.C. Stats. & Regs. ¶ 31,005, 59 Fed. Reg. 55,031 (Nov. 3, 1994) (codified at 18 C.F.R. pt. 2).

[14]We reject DWR's attempted use of *Regional Transmission Organizations*, [Regs. Preambles 1996-2000] F.E.R.C. Stats. & Regs. ¶ 31,089, 65 Fed. Reg. 810 (Jan. 6, 2000) (Order No. 2000), *on reh'g*, F.E.R.C. Stats. & Regs. ¶ 31,092, 65 Fed. Reg. 12,088 (Mar. 8, 2000) (Order No. 2000-A), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001), as irrelevant. Order No. 2000 addresses regional transmission organizations, which are not at issue in this case.

[15]*Remedying Undue Discrimination Through Open Access Transmission Service and Standard Electricity Market Design*, [1998-2002 Proposed Regs.] F.E.R.C. Stats. & Regs. ¶ 32,563 (2002), 67 Fed. Reg. 55,452 (Aug. 29, 2002), 67 Fed. Reg. 58,751 (Sept. 18, 2002), 67 Fed. Reg. 63,327 (Oct. 11, 2002) (codified at 18 C.F.R. pt. 35).

[16]*Standardization of Generator Interconnection Agreements and Procedures*, F.E.R.C. Stats. & Regs. ¶ 31,146, 68 Fed. Reg. 49,846 (Aug. 19, 2003) (Order No. 2003) (codified at 18 C.F.R. pt. 35), *on reh'g*, F.E.R.C. Stats. & Regs. ¶ 31,160, 69 Fed. Reg. 15,932 (Mar. 26, 2004) (Order No. 2003-A), *on reh'g*, F.E.R.C. Stats. & Regs. ¶ 31,171, 70 Fed. Reg. 265 (Jan. 4, 2005) (Order No. 2003-B).

issued subsequent to Order No. 888 demonstrate that Order
No. 888 did not affect FERC's preference of rolling in trans-
mission rates. *See, e.g.*, *W. Mass. Elec. Co.*, 81 F.E.R.C.
¶ 61,152, 61,693 (1997) (rolling in the cost of grid upgrades
without mention of Order No. 888), *aff'd sub nom. W. Mass.
Elec. Co. v. FERC*, 165 F.3d 922 (D.C. Cir. 1999); *see also
Am. Elec. Power Serv. Corp.*, 101 F.E.R.C. ¶ 61,211, 61,910
(2002) (affirming earlier decision to roll in costs associated
with transmission facilities, without discussing Order No.
888, and noting that "historically, the rolled-in method of
transmission cost allocation has been favored").[17]

### 4. FERC Has Sanctioned No Special Pricing Policy With Respect to PG&E's Transmission Facilities.

Finally, DWR argues that, regardless of FERC's standard
pricing policies, FERC has consistently endorsed a policy of
pricing PG&E facilities based on subfunction, and changed

---

[17]With respect to the other orders and policy statements, the selective
language DWR highlights tends to show only that FERC will consider
nontraditional transmission pricing proposals when appropriate. For exam-
ple, the 1994 Transmission Policy Pricing Statement states that rolling in
transmission rates is consistent with longstanding FERC precedent, but
also notes that other methodologies are "supportable." 59 Fed. Reg. at
55,032-33. This statement cannot be stretched to indicate a rejection of
rolled-in pricing.

DWR also cites to portions of the 2002 SMD NOPR and Order No.
2003, but both address the cost allocation of new facilities. *See* SMD
NOPR, 67 Fed. Reg. at 55,479; Order No. 2003, 104 F.E.R.C. ¶ 61,103,
at 1-2, 675-80. Both suggest that, under some circumstances, a more flexi-
ble approach to assigning the costs of constructing interconnection facili-
ties may incentivize states to participate in construction of more isolated
generators. *See, e.g.*, SMD NOPR, 67 Fed. Reg. at 55,479 (noting that
assigning the cost of interconnection facilities to participant generators
could encourage siting and building of such generation facilities). By con-
trast, the facilities in this case were not newly-constructed and such incen-
tives are therefore not implicated. Neither the 2002 SMD NOPR nor Order
No. 2003 dictates a cost assignment process or forecloses rolled-in pricing
under the circumstances presented in this case.

course without presenting any reasons for doing so or establishing that the new pricing method was just and reasonable.

**[8]** Despite DWR's contrary representations in its briefs and during oral argument, FERC has never stated that it favors PG&E's subfunctional method. As respondent highlights, on one occasion FERC adjudicated a rate dispute involving subfunctionalized pricing, but explicitly declined to pass on the merits of the methodology. *See Pac. Gas & Elec. Co.*, 53 F.E.R.C. ¶ 61,146, 61,521 n.66, 61,524 (1990) (Opinion No. 356) (noting that none of the parties had challenged the subfunctional methodology). Opinion No. 356 noted that the method itself had never been litigated, and stated that "PG&E is free to continue the use of its subfunctional methodology or to propose a rolled-in rate in future proceedings. . . . [W]e will continue to evaluate the appropriateness of this or any other pricing methodology on a case-by-case basis." *Id.* at 61,521 n.90.

It appears PG&E sought to change from subfunctionalized rates to rolled-in transmission rates beginning in 1993. *See Turlock Irrigation Dist. v. Pac. Gas & Elec. Co.*, 64 F.E.R.C. ¶ 61,183, at 62,542 (1993); *Pac. Gas & Elec. Co.*, 63 F.E.R.C. ¶ 61,136, at *7 (1993), *proceeding dismissed*, 86 F.E.R.C. ¶ 61,105 (1999). PG&E's requests were challenged before FERC in two cases, but both were resolved without an adjudication of the subfunctionalized method. *See* 64 F.E.R.C. ¶ 61,183, at 62,542-44 (noting that the parties had reached agreement on the rate level and declining to issue a requested declaratory order forbidding the use of a rolled-in rate in the future); 63 F.E.R.C. ¶ 61,136, at *1 (finding that the contract language prohibited change to rolled-in rate).

An administrative law judge did reject a third attempt by PG&E to utilize rolled-in pricing in a transmission rate schedule. *Pac. Gas & Elec. Co.*, 63 F.E.R.C. ¶ 63,018 (1993), *aff'd in part, vacated in part*, 67 F.E.R.C. ¶ 61,239 (1994). Noting that the proposed rate under the new agreement was a steep

increase over the subfunctionalized rate being charged under the parties' current interconnection agreements, the judge found the proposal to be an unjust and unreasonable attempt to charge more for the same service. *Id.* at 65,098. FERC affirmed the judge's rejection of the agreement, noting that no party had excepted to that ruling. *Pac. Gas & Elec. Co.*, 67 F.E.R.C. ¶ 61,239, 61,753 n.5 (1994) (Opinion No. 389), *on reh'g*, 85 F.E.R.C. ¶ 61,230 (1998) (Opinion No. 389-A).

However, FERC later clarified that Opinion No. 389 did not make any findings regarding the merits of a rolled-in rate. *Pac. Gas & Elec. Co.*, 71 F.E.R.C. ¶ 61,394, at 62,547 (1995), *reh'g granted*, 72 F.E.R.C. ¶ 61,217 (1995). In a proceeding conditionally accepting PG&E's proposed rate filing, FERC considered a request by the intervenors to prohibit PG&E from utilizing its proposed rolled-in rate. *Id.* at 62,546. FERC set a hearing for the intervenors to pursue their concerns about the rate, but declined requests to direct PG&E to continue to use the subfunctionalized rate. *Id.* FERC stated that "grandfathering" in a particular rate simply because it was used in the past would stifle innovation and pricing flexibility. *Id.* at 62,547. The parties later settled their dispute. *See Pac. Gas & Elec. Co.*, 94 F.E.R.C. ¶ 61,093, 61,392 (2001).

**[9]** In sum, when FERC has considered the subfunctionalized method, it has not expressed the sort of favorable opinions that would render its decision to permit rolled-in pricing in this case arbitrary and capricious. DWR's claim that FERC's decision is a "dramatic reversal" of earlier policy is simply erroneous.[18]

---

[18]Finally, we decline to entertain DWR's argument that FERC is playing favorites with PG&E. DWR failed to raise this argument before FERC on DWR's Request for Rehearing, as is jurisdictionally required, and offered no reason for failing to do so. *See* 16 U.S.C. § 825*l*(b); *High Country Res. v. FERC*, 255 F.3d 741, 744-47 (9th Cir. 2001).

### C.  Due Process and Substantial Evidence

DWR argues that the testimony of PG&E witness Robert Jenkins, upon which FERC relied heavily, violated DWR's right to due process and that the order is not supported by substantial evidence. Jenkins was properly heard as a rebuttal witness. Moreover, Jenkins' written testimony was available one month before he testified. DWR therefore had notice of his testimony and was free to object to it or seek to present additional responsive testimony. DWR did neither. Thus, DWR's objections to this testimony are meritless. *Cf. Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1011-12 (D.C. Cir. 2005) (concluding that the Commission violated petitioners' due process rights when it adopted a rate premium *sua sponte* and without evidence in the record). DWR's remaining objections are equally without merit. They merely reiterate DWR's own dissatisfaction with FERC's determination rather than identify any objective shortcomings in the evidence or the procedures followed. Accordingly, we find no error on either count.

### III.  CONCLUSION

FERC did not act arbitrarily or capriciously in allowing PG&E to roll in the costs of the three sets of facilities at issue. The facilities each serve a network transmission function. FERC employed a test whereby any showing of a network transmission function suffices to bring the facility into the transmission tariff. Only facilities that perform exclusively generation-related functions are generation-related for purposes of the tariff. DWR cites no precedent which bars FERC from applying the "exclusive use" test adopted here. Moreover, the test is in line with FERC precedent and thus provides consistent treatment of transmission pricing.

DWR's objections to the rolled-in cost allocation method associated with the tariff are also unfounded. FERC has consistently required rolled-in pricing for the facilities compris-

ing the integrated transmission grid, based on the rationale that transmission customers all benefit from the operation of the integrated grid. FERC has not moved away from favoring rolled-in pricing for high-voltage transmission facilities and has never endorsed PG&E's previous subfunctionalized method. Finally, DWR's due process and substantial evidence objections are unsupported by the record.

Accordingly, DWR's petition for review is **DENIED.**