# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA TROUT,

_Petitioner,_

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

_Respondent._

No. 07-73664

FERC Project No.
2426-204

CALIFORNIA TROUT,

_Petitioner,_

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

_Respondent._

No. 07-74494

FERC Project No.
2426-206

FRIENDS OF THE RIVER,

_Petitioner,_

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

_Respondent._

No. 08-71593

FERC Project No.
2426-208

OPINION

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
February 12, 2009—San Francisco, California

Filed July 20, 2009

9159

Before: Ronald M. Gould, Jay S. Bybee, and
Timothy M. Tymkovich,* Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Gould

---

*The Honorable Timothy M. Tymkovich, United States Circuit Judge
for the Tenth Circuit, sitting by designation.

## COUNSEL

Daniel P. Selmi (argued), Los Angeles, California, and Amy J. Bricker, Rachel B. Hooper, and Amanda Garcia, San Francisco, California, for the petitioners.

Holly E. Cafer, Kathrine Henry (argued), Cynthia Marlette, and Robert H. Solomon, Washington, D.C., for the respondent.

**OPINION**

BYBEE, Circuit Judge:

The Supreme Court has long stressed that "the formulation of procedures [is] basically to be left within the discretion of the agencies to which Congress [has] confided the responsibility for substantive judgments." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524-25 (1978). Agencies must have the ability to manage their own dockets and set reasonable limitations on the processes by which interested persons can support or contest proposed actions. In this respect, an agency's procedural rules operate much as our own rules of procedure do: we require litigants to observe the orderly procedures of the court, even if such rules occasionally bar inattentive or ill-advised parties from our courtrooms. So long as an agency's procedural rules do not afford petitioners less protection than the minimum mandated by the Administrative Procedure Act ("APA") and the Constitution, we are not free to "improperly intrude[ ] into the agency's decisionmaking process" and second-guess its administrative tradeoffs. *Id.* at 525.

In this case, petitioners California Trout ("CalTrout") and Friends of the River ("FOR") contend that the Federal Energy Regulatory Commission ("the Commission") applied its rule governing intervention in a license renewal proceeding in an arbitrary and capricious fashion. Although petitioners have set forth evidence that their late intervention would not prejudice the Commission's proceeding, under the circumstances we cannot find that the Commission's decision was an abuse of its discretion. The regulation at issue explicitly confers on the Commission a broad power to differentiate among untimely interveners and permits the Commission to summarily reject a prospective intervener who cannot demonstrate "good cause" for its untimely motion. Because we find that the Commission reasonably determined that petitioners lacked

good cause for their untimely attempt to intervene, we deny the petition for review.

I

A

*Bufo microscaphus californicus*, the arroyo southwestern toad, is a small (two to three inch) amphibian with light greenish gray or tan warty skin and dark spots. *See* Endangered and Threatened Wildlife and Plants; Determination of Endangered Status for the Arroyo Southwestern Toad, 59 Fed. Reg. 64,859 (Dec. 16, 1994) (codified at 50 C.F.R. pt. 17). The toad can usually be identified by its movement, which consists of hopping (as opposed to walking or leaping), and its high-pitched trill that adult males emit during courtship. *Id.* It is not an especially peripatetic species—adult toads generally range no farther than a mile or so from the streams where they breed, and none are known to live outside the state of California. *See* Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Arroyo Toad, 66 Fed. Reg. 9415 (Feb. 7, 2001) (codified at 50 C.F.R. pt. 17).

The arroyo toad is quite particular about its habitat. It only lives in rivers or large streams that have shallow, gravelly pools, sandy terraces, and minimal vegetative cover. 59 Fed. Reg. at 64,859. The adult toad deposits its eggs in these shallow pools, where the potentially destructive water current is at a minimum, and the young toads eventually leave the pools to forage for insects on the sandy terraces. *Id.* The larger toads often burrow into the sandy terraces to create shelter and to escape from the sun's potentially lethal heat. *Id.* For this reason, urbanization and the rapid construction of dams in California beginning in the 1900s (which altered the natural water flows on which the toad had come to depend) severely degraded the arroyo toad's habitat. *Id.* By the early 1990s, nearly 76 percent of the species' habitat had been degraded,

*see* 66 Fed. Reg. at 9414, and almost all the existing toad populations were near extinction. 59 Fed. Reg. at 64,859.

One place where the remaining arroyo toads continued to dwell was Piru Creek, a stream that meanders south from northwestern Los Angeles County through eastern Ventura County until it drains into the Santa Clara River. The creek runs through two large lakes: the northern Pyramid Lake and the southern Piru Lake. The eighteen-mile stretch of creek between these two lakes is known as "Middle Piru Creek." This area of the creek is surrounded mainly by national forest land (the Angeles National Forest and the Los Padres National Forest) and is used primarily for recreational activities, chief among which is fly-fishing.

It is surprising that the species had managed to survive for so long in Middle Piru Creek. In 1968, as part of the California Aqueduct Project,[1] construction began on Pyramid Dam, a 408-foot earth and rockfill edifice intended to prevent the natural flow of water from Pyramid Lake into Middle Piru Creek. The dam was completed in 1973, and in 1978 the Commission licensed the California Department of Water Resources ("DWR") and the Los Angeles Department of Water and Power to operate the dam and an associated power plant. This license strictly regulated the minimum amount of water that DWR could release from the dam at any one time. As a result, the increased water flow emitted from Pyramid Dam significantly altered the character of Middle Piru Creek.

---

[1]The California Aqueduct is one component of the enormous "State Water Project" designed to mitigate California's uneven distribution of water resources by ferrying water from the wet northern areas of the state to the more arid south. The general history of the project is described in the mass of California and federal case law adjudicating disputes over its scope. *See generally, e.g.*, *In re Bay-Delta Programmatic Env. Impact Report Coordinated Proceedings*, 184 P.3d 709 (Cal. 2008); *United States v. State Water Res. Control Bd.*, 227 Cal. Rptr. 161 (Cal. App. 1986).

Article 52 of the original license created the minimum flow requirements for the release of water from Pyramid Dam: DWR was instructed to release a continuous flow of at least 5 cubic feet per second ("cfs") in the winter and spring and at least 10 cfs in the summer and fall. Although these guidelines were slightly altered in 1982 to require occasional higher minimum releases depending on the ambient air temperature, they remained essentially unchanged until a confluence of events in the early 1990s revealed their detrimental effect on the arroyo toad.

First, in 1992 and 1993, large inflows into Pyramid Lake required DWR to release water at approximately 25 cfs during some months. Then, on December 16, 1994, the arroyo toad was officially added to the federal endangered species list.[2] *See* 59 Fed. Reg. 64,859. Due to worries that large fluctuations in the minimum flow would destroy arroyo toad eggs and tadpoles (by stranding them on land when water flows suddenly dropped and by washing them away when water flows dramatically increased), DWR changed its operating procedures—using a steady flow of 25 cfs from April through August (when arroyo toads were breeding) and then slowly reducing the flow during the winter months (when the tadpoles had dispersed). Unfortunately, these operating procedures, which had the effect of creating unnaturally large flows

---

[2]The Endangered Species Act of 1973 (codified at 16 U.S.C. § 1531 *et seq.*), called by some "the most comprehensive legislation for the preservation of endangered species ever enacted," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978), instructs the Secretary of the Interior to list any fish, wildlife, or plant species determined to be endangered or threatened by natural or manmade factors. 16 U.S.C. § 1533(a). Once a species is listed, the Act makes it unlawful to "take" ("harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect," *id.* § 1532(19)) the species without a permit. *Id.* § 1538(a)(1)(B). A person may effect a taking of (by "harm[ing]") a protected species by causing "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. *See also generally Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995).

during the summer months and unnaturally low flows during the winter months, did not appear to actually benefit the toad.

Indeed, evidence gathered during the new high flow regime indicated that the increased flows might actually be damaging to the arroyo toad. In 2003, the U.S. Fish and Wildlife Service informed DWR that these unnatural flows were probably causing the incidental take of the arroyo toad and deteriorating its habitat. Specifically, the large release of water in the summer months created abundant vegetative growth on the creek's banks and encouraged increased water velocities downstream. This allowed noxious arroyo toad predators, such as bullfrogs, crawfish, and large-mouth bass, to multiply throughout the creek. It also prevented the toads from reproducing effectively—the large water flow eliminated the gravelly pools in which the toads would normally lay their eggs, and had the more pernicious effect of washing downstream any unprotected eggs and tadpoles. The reduced flow of water in the winter months prevented the natural flooding that would scour vegetation and replenish the finer sediments that the arroyo toad preferred.

The large summer flows did benefit at least one species in Middle Piru Creek: rainbow trout. Because rainbow trout prefer cold water (and may die if water temperatures are too high) they benefit from a deeper (and hence cooler) habitat. Since 1999, DWR maintained a trout fishery in the upper part of Middle Piru Creek, known as "Frenchman's Flat," and stocked it annually with around 3000 pounds of rainbow trout. Also, a number rainbow trout inhabited the area immediately downstream from Pyramid Dam above Frenchman's Flat—a designated "catch-and-release" area popular with local anglers. Because a weir separated Frenchman's Flat from the catch-and-release area, those trout in the catch-and-release area were a naturally-reproducing population not related to the stocked fish.

To remedy the problems the new flow regime was creating for the arroyo toad, the Fish and Wildlife Service recom-

mended that DWR return Middle Piru Creek to a "natural flow regime," in which water would be released from Pyramid Dam in accordance with the rate of flow from Upper Piru Creek into Pyramid Lake. DWR accordingly filed an application with the Commission on March 17, 2005, to amend its license and eliminate all minimum flow requirements so as to accurately simulate natural flows. It attached an Environmental Impact Report ("EIR") analyzing the effects of the natural flow regime on the wildlife of Middle Piru Creek. The EIR concluded that a natural flow regime would expand the arroyo toad's habitat and diminish the populations of arroyo toad predators. The report also concluded that populations of naturally-breeding trout (those inhabiting the catch-and-release area above Frenchman's Flat) would be adversely affected by the decreased flows. Because, however, DWR's analysis indicated that the naturally-reproducing trout were genetically identical to those stocked at Frenchman's Flat (and thus were descendants of hatchery-raised fish rather than a wild population), the EIR determined that this adverse impact would not be an environmentally significant one.

B

On June 8, 2005, the Commission issued public notice of DWR's application for a license amendment. This public notice clearly established July 8, 2005 as the final date for filing comments or making motions (including motions to intervene) in the proceedings.

Neither CalTrout (an organization designed to preserve California's wild trout populations) nor FOR (an organization designed to preserve California's rivers) filed a motion to intervene by the deadline. CalTrout did submit numerous comments on the proposed license amendment: on March 26, 2005, it submitted a comment about compliance with the Clean Water Act; on April 15, 2005, it submitted a comment pointing out that the Fish and Wildlife Service had removed a portion of Piru Creek from the final critical habitat designa-

tion for the arroyo toad; and on July 8, 2005, it submitted a comment advising DWR that it needed to consult formally with certain federal agencies in order to comply with the Endangered Species Act. FOR failed to file any comments on the draft EIR.

The organizations' failures to intervene were not necessarily mistakes—at the time, the statutory milieu offered a separate avenue by which CalTrout and FOR could challenge the Commission's proceedings. CalTrout believed that the naturally-reproducing trout above Frenchman's Flat might be related to steelhead,[3] an endangered trout species. *See* Endangered and Threatened Species: Final Listing Determinations for 10 Distinct Population Segments of West Coast Steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (codified at 50 C.F.R. pts. 223 & 224). CalTrout thought that this genetic relationship indicated that Middle Piru Creek could provide a genetic bank that the endangered steelhead could potentially use to propagate. Thus, CalTrout had expected to be able to challenge any Commission action under the Endangered Species Act because of its purported impact on steelhead. In January 2006, however, the National Marine Fisheries Service published its final rule on the designation of steelhead critical habitat under the Endangered Species Act. *See* Endangered and Threatened Species; Designation of Critical Habitat for Seven Evolutionarily Significant Units of Pacific Salmon and Steelhead in California, 70 Fed. Reg. 52,488, 52,581 (Sept. 2, 2005) (codified at 50 C.F.R. pt. 226). This final rule, unlike the proposed draft rule, did not list Middle Piru Creek as a critical habitat for steelhead. Such a designation would have required the Commission to consult with the National Marine Fisheries

---

[3]*Oncorhynchus mykiss* (steelhead) are essentially rainbow trout, with one important difference—they are anadromous, meaning that they are born in freshwater, migrate to saltwater to spend their adult lives, and then return to their native freshwater stream to spawn. The genetic differences between the two species are not entirely clear—rainbow trout can give birth to steelhead, and vice versa.

Service about protections for steelhead before implementing the proposed action[4] —and CalTrout and FOR would have had an opportunity to challenge aspects of this consultation. Because no actual steelhead inhabited Middle Piru Creek, the Service's final rule placed significant impediments on this avenue for judicial review.[5]

---

[4]Section 7(a)(2) of the Endangered Species Act "imposes a procedural consultation duty whenever a federal action may affect an ESA-listed species." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008). That section provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). In cases like this where the Commission would have been required to consult with the National Marine Fisheries Service, the Endangered Species Act would have required the Fisheries Service to issue a "written biological opinion." *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2526 (2007) (citing 16 U.S.C. § 1536(b)(3)(A)). A biological opinion must "set[ ] forth the [issuing agency's] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). More importantly, the issuance of such an opinion "is considered a final agency action, and therefore subject to judicial review." *Nat'l Wildlife Fed'n*, 524 F.3d at 925 (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

[5]Under regulations implementing Section 7's consultation and biological opinion requirement, the Commission must engage in "formal consultation" (consultation resulting in the production of a biological opinion) only in certain circumstances. *See* 50 C.F.R. § 402.14. If the Commission reviews its actions and determines they will not "affect listed species *or critical habitat*," no formal consultation is required. *Id.* (emphasis added). Likewise, the Commission "need not initiate formal consultation if . . . as a result of informal consultation with the Service under [50 C.F.R.] § 402.13, the [the Commission] determines that the proposed action is not likely to affect any listed species *or critical habitat*." 50 C.F.R. § 402.14 (emphasis added). Because Middle Piru Creek was not listed as a critical habitat for steelhead, it is unlikely that the Commission would have been required to consult formally with the Fisheries Service or another agency, and thus no biological opinion would be issued that the petitioners could challenge. Although the petitioners could still potentially challenge the

Nearly twenty-one months after it issued public notice, on March 1, 2007, the Commission issued a draft Environmental Assessment ("EA") on the proposed license amendment and solicited public comments. Both CalTrout and FOR filed comments on the draft EA. About this same time, CalTrout and FOR also filed untimely motions to intervene in the proceedings. CalTrout moved to intervene on April 13, 2007 (twenty-one months after the July 8, 2005 deadline). FOR filed its motion to intervene on June 11, 2007 (twenty-three months after the deadline and two months after it filed comments on the draft EA).

The Commission considered and rejected the motions to intervene, holding that neither party had met the regulatory standard for filing a late intervention motion. Both parties sought rehearing on these decisions. The Commission denied CalTrout's request for rehearing on July 19, 2007. CalTrout sought a second rehearing, which was denied on September 20, 2007. The Commission denied FOR's rehearing request on February 21, 2008. Both parties petitioned for review in this court, arguing that the Commission abused its discretion in denying their late intervention motions.

CalTrout and FOR argue that because they clearly meet the regulatory standard for late intervention, the Commission acted arbitrarily and capriciously in denying their motions to intervene. Petitioners also argue that the Commission misapplied its own precedent in so doing.

---

Commission's decision not to engage in formal consultation, *see generally Cal. Sportfishing Prot. Alliance v. FERC*, 472 F.3d 593 (9th Cir. 2006) (discussing our jurisdiction to hear citizen suits challenging an agency decision to forgo formal consultation), there would have been significant obstacles to such a suit, *see id.* at 596-99. Moreover, it is unlikely that an action challenging the Commission's failure to formally consult with the Service would have been successful if Middle Piru Creek were not a critical habitat for steelhead.

## II

Our review of the Commission's decisions is by law highly deferential. "We examine only whether [a] decision was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law." *Steamboaters v. FERC*, 759 F.2d 1382, 1388 (9th Cir. 1985).[6] Here, we review the Commission's decisions not to permit late intervention specifically for abuse of discretion, *see Covelo Indian Cmty. v. FERC*, 895 F.2d 581, 587 (9th Cir. 1990), and we may only overturn the decision if it was not "based on a consideration of the relevant factors" or if it evinces "a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977)). In accordance with *Chevron*, we must also give "substantial deference" to the Commission's interpretation of its own regulations. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). "In other words, we must defer to the [Commission's] interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the [Commission's] intent at the time of the regulation's promulgation." *Id.* (internal quotation marks omitted); *see generally Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865-66 (1984) . Likewise, we must give deference to the Commission's interpretation of its own orders. *Cal. Dep't of Water Res. v. FERC*, 489 F.3d 1029, 1036 (9th Cir. 2007).

---

[6]As the D.C. Circuit has noted, "[t]he judicial review provision governing petitions for review of FERC orders was drafted long before the passage of the APA; concerning the scope of review, it explicitly states only that the finding of 'the Commission as to the facts if supported by substantial evidence shall be conclusive.' " *Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 663 (D.C. Cir. 1996) (quoting 16 U.S.C. 825l(b)) (emphasis removed). Because we, like the D.C. Circuit, have recognized that "the Court reads the statute implicitly as providing review on arbitrary and capricious grounds," *see id.*, we review the Commission's decisions under both standards. *Steamboaters*, 759 F.2d at 1388.

A

The Commission operates under the Federal Power Act ("the Act"), a "complete scheme of national regulation" intended to "promote the comprehensive development of the water resources of the Nation." *First Iowa Hydro-Elec. Coop. v. FPC*, 328 U.S. 152, 180 (1946). The Act authorizes the Commission to "issue licenses . . . for the purpose of constructing, operating, and maintaining dams [or other hydroelectric projects] . . . for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction." 16 U.S.C. § 797. Although these licenses are normally binding for several decades, *see* 16 U.S.C. § 799 (setting fifty years as the maximum life of a license), they can be amended, as here, upon application by the licensee and public notice. 16 U.S.C. § 799. In amending a license, the Commission must comply with the requirements of the National Environmental Policy Act ("NEPA"), which directs all federal agencies, "to the fullest extent possible," to prepare "a detailed statement on . . . the environmental impact" of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i).

The Federal Power Act specifically "prescribe[s] the procedures and conditions under which, and the courts in which, judicial review of [the Commission's] orders may be had." *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958). Section 313 of the Act provides that only "parties" to Commission proceedings may seek administrative or judicial review of the Commission's final orders. *See* 16 U.S.C. § 825l(a) ("Any person . . . aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person . . . is a party may apply for a rehearing . . . ."); *id.* § 825l(b) ("Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in [a specified]

United States Court of Appeals . . . .”). Because section 313 enumerates “the specific, complete and exclusive mode for judicial review of the Commission’s orders,” *City of Tacoma*, 357 U.S. at 336, a non-party to the Commission’s proceedings may not challenge the Commission’s final determination in any court.[7]

Section 308 of the Act gives the Commission the power to promulgate regulations governing the process through which interested persons become “parties” within the meaning of the Act. Section 308(a) provides:

> In any proceeding before it, the Commission, *in accordance with such rules and regulations as it may prescribe*, may admit as a party any interested State, State commission, municipality, or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.

16 U.S.C. § 825g(a) (emphasis added).

**[1]** Pursuant to this statutory authority, the Commission has promulgated Rule 214, which governs what persons may intervene and thereby become parties in Commission proceedings. *See* 18 C.F.R. § 385.214. Under the rule, a person who fails to intervene may not become a party and later chal-

---

[7]There is an equitable exemption to this rule for petitioners challenging the Commission’s denial of party status, because “[i]t would be grossly unfair to deny judicial review to a petitioner objecting to an agency’s refusal to grant party status on the basis that the petitioner lacks party status.” *Covelo Indian Cmty.*, 895 F.2d at 586 (quoting *N. Colo. Water Conservancy Dist. v. FERC*, 730 F.2d 1509, 1515 (D.C. Cir. 1984)) (internal quotation marks omitted). In such cases, the petitioner is “considered a party for the limited purpose of reviewing the agency’s basis for denying party status.” *Id.* (quoting *N. Colo. Water Conservancy Dist.*, 730 F.2d at 1515) (internal quotation marks omitted).

lenge the ultimate agency determination. *See Covelo Indian Cmty.*, 895 F.2d at 585-86 ("When FERC issued the relicense, it also denied the [petitioner's] motion to intervene, thereby denying the [petitioner] party status."). Rule 214 does not categorically bar intervention for persons filing untimely motions. Instead, the rule provides that the Commission may allow interested persons to intervene after the deadline for such interventions has passed, and enumerates specific circumstances in which the time limitations may be waived.

**[2]** Under Rule 214, a *timely* movant must simply "state, to the extent known, the position taken by the movant and the basis in fact and law for that position," 18 C.F.R. § 385.214(b)(1), and demonstrate with enough factual detail that the movant either has a statutory or regulatory right to participate, "represents an interest which may be directly affected by the outcome of the proceeding," or that its participation would be in the public interest. *Id.* § 385.214(b)(2). An *untimely* movant must demonstrate more: he must "show good cause why the time limitation should be waived." *Id.* § 385.214(b)(3). Rule 214 also enumerates specific factors that Commission "may" consider in acting upon such a motion. Specifically, the Commission "may consider whether (i) [t]he movant had good cause for failing to file the motion within the time prescribed; (ii) [a]ny disruption of the proceeding might result from permitting intervention; (iii) [t]he movant's interest is not adequately represented by other parties in the proceeding; (iv) [a]ny prejudice to, or additional burden upon, the existing parties might result from permitting the intervention;" and (v) the motion conforms to the regulation's basic procedural requirements. *Id.* § 385.214(d)(1). In other words, an untimely movant must, at a minimum, demonstrate good cause and, in addition, should address the further factors the Commission may consider in its discretion.**[8]**

_____

**[8]**We note that Rule 214 does not appear to require the Commission to reject an untimely movant who has failed to "show good cause why the

**[3]** Rule 214's language allots broad discretion to the Commission to grant or deny an untimely motion for intervention. The rule neither conclusively defines "good cause" nor suggests that a showing of all the enumerated factors will satisfy a petitioner's burden. Indeed, the use of the permissive "may" rather than the obligatory "shall" suggests that the Commission may not only consider other, non-enumerated factors in adjudicating a motion for untimely intervention, but can affirmatively abstain from including even one or more of the enumerated factors in its decisional calculus. *See id.* § 385.214(d)(1). *See also Power Co. of Am., L.P. v. FERC*, 245 F.3d 839, 843 (D.C. Cir. 2001) ("Failure to establish good cause is . . . a sufficient condition to deny intervention, so the Commission was not obligated to consider any other factor."); *City of Orrville v. FERC*, 147 F.3d 979, 991 (D.C. Cir. 1998) ("The text of [Rule 214] does not compel consideration of each of the factors. . . ."). Additionally, because the regulation does not indicate what weight the Commission is required to place on each enumerated factor, even a failure to prove one of the factors could be sufficient to support the Commission's decision to deny intervention—notwithstanding a successful showing of good cause.

## B

Petitioners make two objections to the Commission's application of Rule 214. First, petitioners claim that the Commis-

---

time limitation should be waived," 18 C.F.R. § 385.214(b)(3). The requirement that an untimely movant make a showing of good cause is found in paragraph (b) of Rule 214, and thus is a factor that the Commission "may" consider in acting on the motion to intervene. *See id.* § 385.214(d)(1)(v) ("[T]he decisional authority may consider whether . . . [t]he motion conforms to the requirements of paragraph (b) of this section."). *See also Alaska Power & Tel. Co.*, 98 F.E.R.C. ¶ 61,092, 61,278 (2002) ("In short, there is no right to late intervention in Commission proceedings under Rule 214. Rather, the rule affords the Commission the discretion to grant late intervention based on a showing of good cause, as well as consideration of other relevant factors.").

sion arbitrarily and capriciously ignored facts establishing good cause for their untimely intervention. Second, petitioners assert that the Commission acted arbitrarily and capriciously in assessing Rule 214's other enumerated factors—which petitioners claim weigh strongly in favor of allowing late intervention. Because, as discussed below, neither of these arguments is persuasive, we deny petitioners' request to overturn the Commission's determinations on such a basis.

1

Petitioners first argue that the Commission failed to correctly apply the "good cause" standard when rejecting their untimely intervention motions. Petitioners claim that the Commission's decision to issue an EA rather than a full-fledged Environmental Impact Statement ("EIS") gave them good cause to intervene. They contend that NEPA mandates intervention in such cases where an agency issues an EA. Additionally, petitioners assert that new information revealed after the July 8, 2005 intervention deadline gave them good cause to intervene.[9]

---

[9]Petitioners also argue that certain provisions of the Endangered Species Act require a finding of good cause. Because petitioners failed to present this argument to the Commission, however, and have not convinced us that there was a reasonable ground for their failure to do so, we cannot rule on it for the first time on appeal. *See* 16 U.S.C. § 825l(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."); *High Country Res. v. FERC*, 255 F.3d 741, 745-46 (9th Cir. 2001) (requiring a petitioner to specifically and unambiguously raise an objection in a request for rehearing before bringing it to the appellate court). Although petitioners raised such objections in their initial requests for late intervention, this is not sufficient—petitioners failed to make the same objections *in their applications for rehearing* before the Commission. *See* 16 U.S.C. § 825l(b).

*The Issuance of the EA*

[4] Under NEPA, if an agency determines that a project will "significant[ly] affect[ ]" the environment, the agency must prepare an EIS, "a detailed statement on . . . the environmental impact" of the proposed project. 42 U.S.C. § 4332(2)(C). "As a preliminary step, an agency may prepare an EA in order to determine whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). *See* 40 C.F.R. § 1508.9 (describing an EA as a "concise public document . . . that serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."). An agency must go further, and prepare an EIS, "if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir. 1988) (internal alterations and quotation marks omitted). *See* 40 C.F.R. § 1502.1 (describing the basic contents of an EIS). An EA "need not conform to all the requirements of an EIS, [but] it must be sufficient to establish the reasonableness of the decision not to prepare an EIS." *Ctr. for Biological Diversity v. Nat. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008) (quotations and alteration omitted).

Although NEPA does not require federal agencies to "assess . . . consider . . . [and] respond" to public comments on an EA to the same degree as it does for an EIS, *see* 40 C.F.R. § 1503.4, an agency must permit some public participation when it issues an EA. In particular, the agency must "involve environmental agencies, applicants, and the public, to the extent practicable," *id.* § 1501.4(b), and "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," *id.* § 1506.6(a).

[5] In implementing NEPA's requirements for public participation, the Commission has promulgated a rule automati-

cally permitting late intervention when it issues a draft EIS. *See* 18 C.F.R. § 380.10(a)(1). This rule provides that "[i]n addition to submitting comments on the NEPA process and NEPA related documents, any person may file a motion to intervene in a Commission proceeding dealing with environmental issues under the terms of [Rule 214]." *Id.* § 380.10(a)(1)(i). So long as such a motion "is filed within the comment period for the draft environmental impact statement" it will be deemed timely under Rule 214. *Id.* § 380.10(a)(1)(i). The Commission has no similar rule for motions filed during the comment period for a draft EA. *See Cameron LNG, LLC*, 118 F.E.R.C. ¶ 61,019 (2007).

**[6]** Given this regulatory background, it is clear that the Commission does not consider the mere issuance of a draft EA to be determinative of good cause under Rule 214. If it did, the Commission would have promulgated a rule automatically permitting late intervention when it issued a draft EA, as it has done for those occasions where it issues a draft EIS. In the absence of such a rule, we cannot find the Commission's determinations that petitioners lacked good cause arbitrary and capricious simply because the Commission issued a draft EA.

Petitioners contend that because in this case the Commission's decision to issue an EA and not an EIS violated NEPA (and was thus "unexpected"), the draft EA gave them good cause to intervene. But petitioners have put the cart before the horse—they essentially argue that because they are about to be denied the benefits of intervention they should be deemed as having good cause to intervene. If the Commission's decision to issue an EA rather than an EIS violates NEPA, the proper course is for petitioners to challenge *that* decision in the proper forum. *See* 16 U.S.C. § 825l(b). Of course, because of their mistake in failing to intervene, petitioners now lack standing to pursue such a suit. *See id.* § 825l(b) ("Any *party* to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain

[judicial] review . . . ." (emphasis added)); *Covelo Indian Cmty.*, 895 F.2d at 585. It turns Rule 214 on its head, however, to argue that this lack of standing gives the petitioners good cause to intervene. If, as petitioners claim, losing one of the benefits of intervention constitutes "good cause" under Rule 214, then that rule is truly toothless—no untimely petitioner will ever lack good cause, since by definition no petitioner can obtain the benefits of intervention until he actually intervenes.[10]

Petitioners also argue that the Commission's failure to provide an exemption for intervention in cases where it issues a draft EA violates NEPA's requirement that it "involve environmental agencies, applicants, and the public, to the extent practicable." 40 C.F.R. § 1501.4(b); *see also id.* § 1506.6. This argument overstates the pertinent NEPA regulations.

Although we have not unequivocally defined what sort of public participation is required to meet NEPA's amorphous standards, we have recognized that the level of participation required by NEPA's implementing regulations is not substantial. We have held that "a complete failure to involve or even inform the public about an agency's preparation of an EA" would violate NEPA's regulations, *see Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003), but have also concluded that "the circulation of a draft EA is not required in every case." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008).

**[7]** We have never suggested that *intervention*—much less *untimely intervention*—is necessary to satisfy NEPA's

---

[10]The Commission has rejected variations on petitioners' argument numerous times. *See, e.g.*, *PJM Interconnection, LLC*, 116 F.E.R.C. ¶ 63,031 (2006); *Transok, L.L.C.*, 89 F.E.R.C. ¶ 61,055 (1999) ("By failing to intervene in a timely fashion, [petitioner] assumed the risk that the parties would settle the case in a manner not to its liking.")

requirements. In *Citizens for Better Forestry*, we remarked that 40 C.F.R. § 1501.4(b) and 40 C.F.R. § 1506.6 meant that "the public must be given an opportunity to comment on draft EAs." 341 F.3d at 970 (quoting *Anderson v. Evans*, 314 F.3d 1006, 1016 (9th Cir. 2002)) (internal quotation marks and alteration omitted). Similarly, in *Bering Strait Citizens*, we concluded that "[a]n agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." 524 F.3d at 953. But neither enabling the public to comment nor providing the public with sufficient information to elicit informed responses requires *intervention*. Non-parties to the Commission's proceedings are not prevented from commenting on proposed actions or receiving information about the Commission's decisions. Instead, non-parties are simply unable to challenge the Commission's final decision in court.

**[8]** In this case, the Commission fully satisfied the participation standards we have sublimated from NEPA's implementing regulations. The Commission circulated a draft EA and solicited comments, and both CalTrout and FOR filed comments on the draft EA. In its decisions denying petitioners' motions for intervention, the Commission noted that "it [would] consider all comments from [petitioners] with full weight," *see* 120 F.E.R.C. ¶ 61,057 n.9 (CalTrout); 122 F.E.R.C. ¶ 61,150 (FOR), and petitioners have not suggested otherwise. Petitioners were given a full opportunity to review and comment on the draft EA, as NEPA requires, and they took advantage of that opportunity. We decline to broaden NEPA by construing it to require intervention in such cases as well.

### New Information

Petitioners also assert that new information alerted them to the importance of intervening in the action after the regulatory

deadline had passed. Specifically, petitioners cite three events that they contend create good cause for untimely intervention: (1) the National Marine Fisheries Service's issuance of a final rule in January 2006 failing to list Middle Piru Creek as a critical habitat for endangered steelhead trout, *see* 70 Fed. Reg. at 52,581; (2) a November 2006 report by Fisheries Service scientists working with the California Department of Fish and Game providing evidence that rainbow trout in the Middle Piru Creek are descended from steelhead trout rather than hatchery populations;[11] and (3) a February 2006 report by a consultant to DWR (that petitioners claim they were not able to access until April 2007) indicating that the arroyo toad increased in population in 2005, when there were large summer flows in Middle Piru Creek.[12]

As the Commission pointed out, none of these events divulged a new issue with the license amendment. CalTrout was plainly aware of the potential impact of the license amendment on the wild trout in Piru Creek—in fact, it submitted several comments on that very topic to the Commission *before* the July 8, 2005, deadline for intervention. On April 6, 2005 (three months before the deadline for interventions) CalTrout commented that "the [license amendment] may result in a violation of the Endangered Species Act . . . because of its impact on the Southern California steelhead." On April 25, 2005 (still well within the deadline for intervention), it submitted another comment noting that the Fisheries Service "has identified through genetic testing the trout in this reach of Piru Creek are native rainbow trout." Finally, Cal-

[11]D. Girman & J. C. Garza, *Population structure and ancestry of O. mykiss populations in South-Central California based on genetic analysis of microsatellite data*, Final Report of the National Marine Fisheries Service, Southwest Fisheries Science Center, Santa Cruz, California, for the California Department of Fish and Game Project No. P0350021 and Pacific States Marine Fisheries, Contract No. AWIP-S (Nov. 2006).

[12]Nancy H. Sandburg, *Middle Piru Creek Arroyo Toads (Bufo californicus) Clutch Surveys 2006*, prepared for the California Department of Water Resources (Feb. 2006).

Trout filed a comment a few days after the deadline for intervention (on July 14, 2005) asserting that "the amendment request may have an adverse impact on the federally listed steelhead" and that failure to consult with the Fish and Wildlife Service about the steelhead might open the Commission to "significant citizen suit liabilities."

CalTrout also maintained in these comments that the current flow regime did not significantly damage the arroyo toad. CalTrout's April 6th comment claimed that "past project operations and bypass instream flow releases to Piru Creek below Pyramid Dam have generally benefitted the resource, including the listed Arroyo Toad." This comment argued that "alternative flow regimes warrant further consideration."

Although FOR did not file similar comments, it was also aware of the issues it now presents. First, in November 2004, FOR was served with a copy of DWR's EIR, prepared in expectation of its license amendment. The EIR described in detail the reasons DWR believed the current flow regime was harming the arroyo toad, and the reasons DWR believed a natural flow regime would not harm the endangered steelhead. Later, in March 2005, FOR was served with a copy of DWR's request for a license amendment. This document described the proposed flow regime change and specifically noted that the Fisheries Service had proposed making portions of Middle Piru Creek a critical habitat for steelhead. Thus, beginning in March 2005, several months before the deadline for intervention, FOR had notice that at least one government agency considered Middle Piru Creek a potentially important habitat for steelhead trout; that DWR was applying to change its flow regime in a manner that might result in harm to whatever fish species inhabited the creek; and that DWR was doing so because it believed the new flow regime would benefit the arroyo toad. Although FOR did not have strong scientific support for its arguments that a natural flow regime would harm steelhead and not help the arroyo toad, it knew

that these would be the environmental issues surrounding DWR's license amendment.

[9] In sum, although the 2006 reports now cited by the petitioners provided better support for petitioners' contentions, they did not fundamentally change the issues (or even the arguments) involved. Thus, it was not an abuse of discretion for the Commission to decide that this "new information" did not give petitioners good cause to intervene late. Indeed, it was consistent with the Commission's extant precedent. *See, e.g.*, *S. Cal. Edison Co.*, 100 F.E.R.C. ¶ 61,327 (2002) ("Choosing to focus on other matters rather than to timely respond to a filing before this Commission falls far short of the demonstration of good cause that would support a late intervention request."); *Niagara Mohawk Power Corp.*, 100 F.E.R.C. ¶ 61,247 (2002) ("[Because, b]y their own admission, [petitioners] had some indication that [licensee's] filings in these proceedings may affect their interests," the fact that petitioners claimed that "there appeared to be no disputes relevant to their interests" was not enough to establish good cause for untimely intervention).

In support of their argument that new information can constitute good cause under Rule 214, petitioners present only dicta in two cases involving the Nuclear Regulatory Commission ("NRC"). Neither case is analogous. In *Sierra Club v. NRC*, 862 F.2d 222 (9th Cir. 1988), we addressed whether a late-filed "contention" (issue) with the NRC was "reasonabl[y] specific[ ]" enough (under NRC regulations) to be considered. *Id.* at 226. We noted in dicta, in a footnote, that under the NRC's regulation governing late-filed contentions,[13]

---

[13]Although the NRC's rule governing the untimely admission of contentions is similar to the Commission's Rule 214, there are several important differences. For example, the NRC's rule, unlike Rule 214, instructs the NRC to consider "[t]he availability of other means whereby the petitioner's interest will be protected" *in addition* to "[t]he extent to which the petitioner's interest will be represented by existing parties." *See Sierra Club*, 862 F.2d at 227 (quoting 10 C.F.R. § 2.714(a)(1) (1988)).

new information issued after the deadline for filing contentions could constitute "good cause" for late filing. *Id.* at 227 n.6. The information in *Sierra Club*, however, revealed a safety issue theretofore not considered. *See id.* at 224. Likewise, in *Union of Concerned Scientists v. NRC*, 920 F.2d 50 (D.C. Cir. 1990), the D.C. Circuit noted in dicta that the NRC has ruled that "good cause" under its late-filing rule is "by definition" met "where contentions are filed late only because the information on which they were based was not available until after the filing deadline." *Id.* at 52-53.

Even if we thought that dicta in two NRC cases should inform our judgment about the Federal Energy Regulatory Commission's proceedings, neither case gives us any reason to question the Commission's interpretation of its regulations governing late intervention. In both cases, the "new information" on which petitioners relied was actually new, and revealed an issue not previously considered by either the NRC or the petitioners. In this case, the "new information" does not reveal any new issues: it is simply stronger scientific support for arguments already made to the Commission.

**[10]** Moreover, even if we thought that the 2006 reports supplied good cause for late intervention, the petitioners were still untimely. These reports, and the new Fisheries Service rule, were issued in 2006, and yet petitioners failed to move to intervene until mid-2007—almost a year after the first of the information became available. Given these circumstances, we cannot find arbitrary and capricious the Commission's determinations that new information did not excuse petitioners' failure to intervene in a timely fashion.

2

Petitioners also claim that the Commission's determinations that CalTrout and FOR's late intervention would prejudice the other parties to the proceedings were arbitrary and capricious. They note that (1) no other party opposed their

late intervention motions, (2) DWR was the only other party to the proceeding, (3) the Commission could not legally issue a license amendment until California issued a water quality certification for the project pursuant to the Clean Water Act— a process that is ongoing, and (4) DWR is currently operating Pyramid Dam under an "interim" flow regime substantially similar to that proposed in the license amendment, and thus cannot be prejudiced by prolonged proceedings. Petitioners assert that the Commission's decisions, by failing to account for these facts and by failing to explicitly discuss the factors constituting prejudice under Rule 214, are arbitrary and capricious.

**[11]** Rule 214 sets out five factors that the Commission "may" consider when acting on an untimely motion to intervene. The first factor gives the Commission the discretion to consider whether "the movant had good cause for failing to file the motion within the time prescribed." 18 C.F.R. § 385.214(d)(1)(I). The next three factors constitute the inquiry into "prejudice." The second factor asks whether "[a]ny disruption of the proceeding might result from permitting intervention." *Id.* § 385.214(d)(1)(ii). The third factor looks to whether "[t]he movant's interest is not adequately represented by other parties in the proceeding." *Id.* § 385.214(d)(1)(iii). The fourth factor inquires whether "[a]ny prejudice to, or additional burdens upon, the existing parties might result from permitting the intervention." *Id.* § 385.214(d)(1)(iv). The fifth factor allows the Commission to determine whether the "motion conforms to the requirements of paragraph (b)," *id.* § 385.214(d)(1)(v), including the requirement that the movant "show good cause why the time limitation should be waived," *id.* § 385.214(b)(3).

The Commission's orders denying rehearing on CalTrout and FOR's motions for untimely intervention do not comprehensively address any of the three factors constituting "prejudice." In its order denying rehearing of FOR's motion, the Commission mentions "prejudice" but does not explain either

the basis for finding prejudice or the weight such a finding played in its determination. The Commission notes that its "rules are designed to ensure an orderly administrative process and the certainty that there will be an end to interventions which prolong the proceeding." 122 F.E.R.C. ¶ 61,150 (internal quotation marks omitted). After analyzing whether the new information cited by FOR could give it good cause to intervene, the Commission then concludes that "[a]llowing interventions, 21 months after the deadline, would delay, prejudice, and place additional burdens on the Commission and the licensees." *Id.* It reasons that "[w]ere the Commission to allow new intervention every time a study was conducted or new information was otherwise placed in the record, we would never be able to establish a deadline for interventions, which is necessary for us to conduct orderly proceedings." *Id.* Similarly, when rejecting CalTrout's motion for rehearing, the Commission declares that "[a]llowing intervention, 19 months after the deadline, would delay, prejudice, and place additional burdens on the Commission and the licensees." 120 F.E.R.C. ¶ 61,057. Neither decision addresses whether any disruption of the proceeding might result, whether CalTrout's or FOR's interests would be adequately represented, or how exactly petitioners untimely intervention would "prejudice" or "place additional burdens upon" DWR, the only party to the proceedings. *Cf.* 18 C.F.R. § 385.214(d)(1).

The Supreme Court has advised that "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although "the agency must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made,' " *id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)), and "the reviewing court should not attempt itself to make up for [any] deficiencies [in the agency's reasoning]," *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)),

we should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)) (internal quotation marks omitted).

The Commission's explanations are not "a paragon of clarity." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1146 (9th Cir. 2007). Both orders denying rehearing mention "delay" and "prejudice" almost as throwaway points—the Commission refers to these factors in a single line, in the middle of a paragraph otherwise discussing whether new information might present good cause for late intervention. *See* 122 F.E.R.C. ¶ 61,150; 120 F.E.R.C. ¶ 61,057. Additionally, both decisions discuss the factors in the abstract and do not enumerate the specific reasons why Cal-Trout or FOR's intervention would prejudice or delay the proceedings. Indeed, the Commissions' decisions appear to simply employ boilerplate language from prior decisions in this regard. *Cf.*, *e.g.*, *S. Cal. Edison Co.*, 112 F.E.R.C. ¶ 61,014 (2005) (noting "the absence of any undue delay, prejudice or burden to the parties"); *Sw. Power Pool, Inc.*, 111 F.E.R.C. ¶ 61,118 (2005) (same).

**[12]** Nevertheless, we think that due to the peculiar nature of the regulation at issue, the Commission's path "may reasonably be discerned." *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004). Under Rule 214, the Commission has the discretion to consider good cause, prejudice, and other factors before granting or denying a movant's request for untimely intervention. Good cause is plainly the most important consideration because it is mentioned twice in the Commission's regulation. A motion for intervention "*must* . . . show good cause why the time limitation shall be waived." 18 C.F.R. § 385.214(b)(3) (emphasis added). The Commission may consider whether the motion "conforms to the [procedural] requirements" of paragraph (b)," *id.* § 385.214(d)(1)(v), and whether "the movant had good cause for failing to file the motion within the time prescribed," *id.*

§ 385.214(d)(1)(i). A finding that a movant has failed to show good cause is a sufficient basis for denying late intervention. If the Commission determines that the movant failed to show good cause, it "may," but is not required to, consider any other factor, including prejudice.

**[13]** In other words, a late petitioner must ordinarily show "good cause" and, once that is shown, additionally prove that the late intervention will not prejudice the Commission or other parties. If the Commission determines that an untimely movant lacks good cause, the Commission is not required to consider the remaining factors. *See Power Co. of Am.*, 245 F.3d at 843. Under the Commission's regulation, lack of prejudice is not the same as "good cause." Here, the Commission clearly found that neither FOR nor CalTrout had presented good cause for its untimely intervention. *See* 122 F.E.R.C. ¶ 61,150; 120 F.E.R.C. ¶ 61,057. The Commission discussed at length FOR's and CalTrout's failure to provide "any convincing reasons why it could not have intervened earlier in the proceeding," concluded that the allegedly new information could not provide good cause for FOR to intervene, and held that late intervention "was [not] warranted by the long-standing principles [of NEPA]." 122 F.E.R.C. ¶ 61,150. *See also* 120 F.E.R.C. ¶ 61,057. We thus do not need to "guess at the theory underlying the agency's action," *Chenery Corp.*, 332 U.S. at 196-97, or "infer an agency's reasoning from mere silence," *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) (internal quotation marks omitted). The Commission made clear that petitioners lacked any viable reason for their failure to intervene earlier in the proceedings, and was justified in denying their motions for late intervention solely on that basis, even if, as petitioners claim, no prejudice would result from their untimely intervention. We cannot conclude that by mentioning factors not necessary to its holding, the Commission acted arbitrarily and capriciously or otherwise abused its discretion.

C

Petitioners also object that the Commission's actions are inconsistent with its precedent. Petitioners claim that the Commission inexplicably departed from several prior decisions in which similarly positioned movants were permitted to intervene after the regulatory deadline, and thus that the Commission's decision was arbitrary and capricious. *See Atchinson, Topeka, & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion).

**[14]** We generally expect agencies to deal consistently with the parties or persons coming before them. "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). If an agency fails to adhere to "the rules developed in its precedent, those subject to the agency's authority cannot use its precedent as a guide for their conduct; nor will that precedent check arbitrary agency action." *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 41 (1st Cir. 1989) (Breyer, J.). Accordingly, "[a] settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress." *Atchinson, Topeka, & Santa Fe Ry.*, 412 U.S. at 807.

Consistency is not the only value at issue. Within certain bounds, "[f]ederal agencies have the power to adjust policies and rulings in light of experience." *Cal. Trucking Ass'n v. Interstate Commerce Comm'n*, 900 F.2d 208, 212 (9th Cir. 1990) (quoting *Mont. Power Co. v. Envtl. Prot. Agency*, 608 F.2d 334, 347 (9th Cir. 1979) (quotation marks and alteration omitted). An agency's learned expertise with certain types of decisions gives it the ability to make the sort of informed policy choices that we cannot.

**[15]** The intersection of these principles gives rise to our standard of review for agency decisions interpreting its prior

holdings. Thus, "while an agency may announce new princi-
ples in an adjudicatory proceeding, it 'may not depart, sub
silentio, from its usual rules of decision to reach a different,
unexplained result in a single case.' " *Id.* (quoting *NLRB v.
Silver Bay Local Union No. 962*, 498 F.2d 26, 29 (9th Cir.
1974). *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294
(1974). In other words, "[t]hough the agency's discretion is
unfettered at the outset, if it announces and follows—by rule
or by settled course of adjudication—a general policy by
which its exercise of discretion will be governed, an irrational
departure from that policy (as opposed to an avowed alter-
ation of it) could constitute action that must be overturned as
'arbitrary, capricious, [or] an abuse of discretion' within the
meaning of the Administrative Procedure Act." *INS v. Yueh-
Shaio Yang*, 519 U.S. 26, 32 (1996).

Our task accordingly is to assess whether the cases petition-
ers cite indicate that the Commission departed irrationally
from its prior decisions. If we so conclude, then we must ana-
lyze the Commission's reasons from departing from its past
precedent to determine whether the Commission has "clearly
set forth the ground for its departure from prior norms." *W.
States Petroleum Ass'n v. EPA*, 87 F.3d 280, 284 (9th Cir.
1996).

Petitioners assert that the Commission departed from its
prior precedent by denying them intervention despite the fact
that they raised NEPA claims and other environmental issues
in their motions to intervene. Petitioners cite three cases in
which the Commission granted late intervention to a movant
who filed its motion for late intervention raising issues about
a draft EA.[14] *See Cameron LNG, LLC*, 118 F.E.R.C. ¶ 61,019

---

[14]Although petitioners originally raised numerous Commission cases
allowing late intervention when movants raised "environmental issues,"
they later admitted in their reply brief that all but three of these cases
involved late intervention during the comment period for an EIS, which
falls under the automatic untimely intervention exemption of 18 C.F.R.
§ 380.10(a)(1)(i). *See supra* Part II.B.1.

(2007); *Columbia Gas Transmission Corp.*, 113 F.E.R.C. ¶ 61,118, 61,438 (2005); *Pub. Util. Dist. No. 1 of Okanogan* County, 63 F.E.R.C. ¶ 61,337, 63,202 (1993). None of these cited cases, however, indicate that the Commission here irrationally departed from its prior precedent.

**[16]** Two of the cited cases deal with intervention in a natural gas proceeding, and the Commission has concluded they merit special consideration. In *Cameron LNG*, the Commission held that "[a]lthough . . . an environmental assessment and not an environmental impact statement [was prepared], and although [the movant] moved to intervene and filed comments on the environmental assessment one day late, we will grant [the movant's] motion to intervene." 118 F.E.R.C. ¶ 61,019. But it did so reasoning that "[i]n the interest of giving full consideration to requests for authorization of natural gas projects, including those for LNG facilities, the Commission has a liberal intervention policy in *natural gas cases* at this particular stage of the proceeding, that is before an order on the merits has been issued." *Id.* (emphasis added); *see also Columbia Gas Transmission*, 113 F.E.R.C. ¶ 61,118 (allowing intervention in a natural gas case). Thus, both *Cameron LNG* and *Columbia Gas Transmission* are easily distinguishable from this case—both involve "natural gas projects" that the Commission has concluded involve special circumstances not present here. Far from establishing a broad principle that the Commission will allow untimely intervention whenever a movant raises concerns with a draft EA, these cases establish the opposite—that allowing such intervention is the exception rather than the norm.

Moreover, the petition to intervene in *Cameron LNG* was filed only four months after the deadline for motions to intervene and only one day after the deadline for comments on the draft EA. *Id.* This is in contrast to the petitioners in this case, who filed more than twenty months late. *See Transok, L.L.C.*, 89 F.E.R.C. ¶ 61,055, 61,186 (1999) ("Late intervention at the early stages of a proceeding generally does not disrupt the

proceeding or prejudice the interests of any party . . . [so] the Commission is more liberal in granting late intervention at the early stages of a proceeding, but is more restrictive as the proceeding nears its end." (footnote omitted)) (denying a motion for intervention filed nine months after the deadline).

**[17]** Although *Public Utility District* is not a natural gas case, it too does not support petitioners' claim that the Commission departed from prior precedent. In *Public Utility District*, the Commission held in a very brief one-page order that because it "[was] still in the process of considering [comments filed in response to a draft EA], granting [certain organizations'] motions to intervene out of time [would] not unduly delay or disrupt the proceeding or prejudice any party to it." 63 F.E.R.C. ¶¶ 61,337, 63,202. The Commission's decision (on a motion for rehearing) never mentioned whether the movants had good cause to intervene—indeed, it did not even consider whether there was good cause to intervene. Here, unlike in *Public Utility District*, the Commission explicitly determined that the petitioners did not have good cause to intervene: thus, it was not required, under Rule 214, to give any weight to the fact that late intervention would not delay the proceeding or otherwise prejudice the existing parties. The Commission's decision to treat petitioners differently based on their lack of good cause is not "unreasonable, or plainly inconsistent with the rationale" of *Public Utility District*. *Cal. Trucking*, 900 F.2d at 213.**¹⁵**

In its decisions denying intervention here, the Commission cited numerous cases in which it found that similarly situated persons lacked good cause to intervene late. *See* 122 F.E.R.C. ¶ 61,150 nn.5 & 7 (citing cases); 120 F.E.R.C. ¶ 61,057 nn.4

---

**¹⁵**We note that even if *Public Utility District* were analogous to the facts of this case, "one contrary precedent does not justify reversal of an agency decision where the most recent line of authority is consistent." *Cal. Trucking*, 900 F.2d at 212 (citing *NLRB v. Sunnyland Packing Co.*, 557 F.2d 1157, 1160-61 (5th Cir. 1977)).

& 5 (citing cases). These cases set out the Commission's clear policy of denying intervention to movants who knew (either directly or constructively) that the Commission's proceedings could infringe on their interests, but "sat on their rights" and waited for an adverse result before intervening. *See, e.g. Crown Landing LLC*, 117 F.E.R.C. ¶ 61,209 (2006) ("[Movant's] argument that it discerned no need for a specific intervention prior to issuance of the June 20 Order does not demonstrate good cause for its late motion to intervene."); *Erie Boulevard Hydropower, L.P.*, 117 F.E.R.C. ¶ 61,189 (2006) ("The fact that [a movant] only determined at an extremely late date that it would like to compete for the project site is not sufficient grounds to justify later intervention."); *Fla. Gas Transmission Co.*, 100 F.E.R.C. ¶ 61,241 (2002) (denying motion to intervene filed six months after the deadline because"[the movant] had or should have had knowledge of [the subject matter of the proceeding]").

**[18]** All in all, the Commission has steadfastly and consistently held that a person who has actual or constructive notice that his interests might be adversely affected by a proceeding, but who fails to intervene in a timely manner, lacks good cause under Rule 214. *See, e.g.*, *Bradwood Landing LLC*, 126 F.E.R.C. ¶ 61,035 (2009) (denying late intervention to movant who claimed that scientific studies made it more aware of its interests in the proceeding); *Cent. Neb. Pub. Power & Irrigation Dist.*, 125 F.E.R.C. ¶ 61,192 (2008) ("The Commission expects parties to intervene in a timely manner based on the *reasonably foreseeable issues* arising from the applicant's filings and the Commission's notice of proceedings." (emphasis added)); *Broadwater Energy LLC*, 124 F.E.R.C. ¶ 61,225 (2008) ("Those entities with interests they intend to protect are not entitled to wait until the outcome of a proceeding and then file a motion to intervene once they discover the outcome conflicts with their interests."). This is precisely the position in which petitioners find themselves—each had actual or constructive notice that the DWR license amendment might affect its interests, but neither

intervened until after the Commission issued its draft EA. Because "good cause" is the principal factor the Commission must point to when rejecting an untimely motion to intervene, *see supra* Part II.B.2, this line of precedent applies directly to petitioners' motions. We cannot say that the Commission deviated irrationally from its prior precedent in failing to make an exception to its general rule for petitioners' untimely motions for intervention.

The dissent argues that the Commission deviated from its past precedent because "in hydroelectric cases, the Commission in practice does not impose a good cause requirement on late intervention when there is no risk of prejudice." Dissenting Op. at 9200 (citing *Alaska Power & Tel. Co.*, 98 F.E.R.C. ¶ 61,092 (2002)). The case cited by the dissent, however, establishes nothing more than the entirely unremarkable proposition that, in hydroelectric cases, "the Commission *often* has made no finding of whether the movant has demonstrated good cause for the late [intervention] request." *Alaska Power*, 98 F.E.R.C. ¶ 61,092 (emphasis added).[16] As we have noted, the Commission is perfectly justified in deciding that it will not consider good cause or the other discretionary factors permitted by Rule 214. It is also perfectly justified, however, in considering such factors and denying intervention when it determines that a prospective intervener lacks good cause. *See* 18 C.F.R. § 385.214(b)(3) & (d)(1)(v). Where, as here, the agency's rule gives it the discretion either to consider or to ignore certain factors, we would be remiss to eliminate this discretion by requiring the agency to *always* ignore certain factors just because it has "often" ignored these factors in the past. The parity insisted on by the dissent would force the

---

[16]We note that this statement in *Alaska Power* is dicta. Indeed, after remarking that it had often ignored good cause in the past, the Commission decided to consider the factor in the case before it, and denied the motion for untimely intervention. *See* 98 F.E.R.C. ¶ 61,092 ("There is nothing in [movant's request for late intervention] that makes any showing of good cause for filing late, much less extraordinary grounds to justify late intervention after issuance of a dispositive order.").

Commission either to always consider or always ignore good cause when considering motions for late intervention. We cannot see that either of these outcomes is required by rule or good administrative practice.

[19] Finally, we observe that the Commission's procedural rules are no less important—and, therefore, no less deserving of respect—than our own code of procedure. Such rules provide for orderly decisionmaking and constitute advance notice of the process by which our institutions will conduct themselves. The petitioners knew the rules of the game and assumed the risks of their decision not to intervene. The Commission had no obligation, by statute or by rule, to provide relief for petitioners' failure to intervene in a timely fashion.

### III

For these reasons, CalTrout and FOR's petitions for review of the Commission's decisions denying rehearing are DENIED.

---

GOULD, Circuit Judge, dissenting:

I respectfully dissent and would grant the petition because the Commission has erected an unreasonably high barrier to good cause for late intervention, and without explanation or justification has departed from its own precedent of routinely granting late intervention where there is no risk of prejudice. In denying Petitioners' motions for late intervention, the Federal Energy Regulatory Commission ("the Commission") has arbitrarily imposed a good cause requirement far more stringent than indicated by analogous precedent and at odds with the liberal standard it has applied consistently in similar cases. Moreover, it should not go unnoticed that in denying leave to intervene, the Commission has silenced any party wishing to advance Petitioners' environmental concerns. It is a salient

fact that there are no parties remaining besides the dam opera-
tors and the FERC, and the Commission's ruling prevents
anyone from challenging whether its decision to issue an
Environmental Assessment ("EA") rather than a more com-
prehensive Environmental Impact Statement ("EIS") violates
the National Environmental Policy Act. The Commission may
be happy as a clam to have no party able to challenge its judg-
ment, giving it in effect totally unconstrained discretion, but
in such a case the real loser is the public which will not have
environmental issues aired as they might have been raised by
an intervenor. The Commission does not explain why it has
departed from its prior precedent, and I choose not to be com-
plicit in its denial of late intervention, which impedes the pub-
lic's interest in considering the environmental issues in this
case. This is not to say that the environmental considerations
favor one side or the other on the merits, but only that the
responsible Petitioners should not be shut out of the court-
house.

   The record shows that Petitioners' intervention would not
offend any of the factors normally considered by the Commis-
sion in these cases, factors which together ask whether the
late intervention would create prejudice. *See* 18 C.F.R.
§ 385.214(d)(1). The majority does not dispute that Petition-
ers satisfy all three prejudice factors. Petitioners' involvement
would not disrupt the proceedings in any way; no other party
represents the Petitioners' interests; and there would be no
additional burden upon the existing parties.

   In any common sense assessment, there is strong cause for
the conduct of the Petitioners in seeking late intervention and
little justification on the other side for denying it. Petitioners
seek late intervention because 1) facts discovered intensified
the import of the issue to be challenged through intervention;
2) the Commission issued an EA rather than a more detailed
EIS, thereby eliminating what would have been an automatic
path for intervention; and 3) the Commission denied interven-
tion to another interested federal agency, the National Marine

Fisheries Service, which would have been in the position to advance environmental issues, such as those raised by Petitioners. There is little precedent available in our circuit concerning the meaning of "good cause" which might inform our assessment of the Commission's interpretation of the good cause requirement for late intervention. However, the phrase "good cause" is used throughout our legal system, and often it means little more than that there is a good reason for the action proposed to be taken.[1] Certainly, prior precedent does not favor a rule that to have good cause to intervene one must show that facts have developed permitting a new issue to be raised that could not have been identified before those facts surfaced.[2] It should be sufficient if the new facts make the res-

---

[1]For example, Federal Rule of Civil Procedure 6(b) provides that courts "for good cause" may extend the time limits imposed by the rules of civil procedure. Interpreting this language, courts have said that the good cause standard and an extension "normally will be granted in the absence of bad faith on the part of the party seeking relief or prejudice to the adverse party." 4B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 1154 (3d ed. 1998). Even when the extension is sought after the time limit has expired, the good cause standard is satisfied merely upon a showing of excusable neglect. Fed. R. Civ. P. 6(b)(2). Similarly, a liberal good cause standard applies when setting aside an entry of default. Fed. R. Civ P. 55(c). Motions under this rule "are frequently granted," and good cause is generally found when "the court finds that the default was not the result of gross neglect, that the nondefaulting party will not be substantially prejudiced by the reopening, and the party in default has a meritorious defense." 10A Wright, Miller & Cooper § 2696 (footnotes omitted). Similarly, Black's Law Dictionary defines "good cause" as "a legally sufficient reason . . . . to show why a request should be granted or an action excused," and certainly that and more was shown here. Black's Law Dictionary 235 (8th ed. 2004).

[2]The fact that good cause has been liberally interpreted in other contexts does not necessarily control how good cause should be interpreted in under the FERC's late intervention regulations, 18 C.F.R. §§ 385.214(b) & (d), for it is settled law that "[t]he same or similar words may have different meanings when used in different statutes motivated by different legislative purposes." *Singh v. Ashcroft*, 386 F.3d 1228, 1233 n.8 (9th Cir. 2004). Nonetheless, as Justice Jackson once observed, "the mere fact that a path is a beaten one is a persuasive reason for following it." Robert H. Jackson, *Full Faith and Credit—The Lawyer's Clause of the Constitution*, 45 Colum. L. Rev. 1, 26 (1945).

olution of an issue more important and enhance the impact of a resolution on the parties and the public. Further, the precedent that exists suggests that the meaning of good cause varies depending on the degree of prejudice that would attend an action, so that when prejudice is greater, the cause to justify the action must be greater. The Commission's own precedents apply this type of sliding scale test and, as shown below, have not insisted on a substantial showing of good cause when there was no prejudice.

The majority asserts, without citation to FERC case law, that under FERC regulations a late petitioner must both show good cause and prove that late intervention would not cause prejudice. Op. at 9189-90. The Commission, however, has interpreted its own regulations differently; it does not require independent showings of both good cause and lack of prejudice. Rather, FERC precedent shows that the agency regularly permits late intervention without requiring a showing of good cause, when intervention would not cause prejudice.

In my view, the Commission should have followed its precedent of *Alaska Power & Telephone Co.*, 98 F.E.R.C. ¶ 61092 (2002), in which it said that it "has generally adopted a liberal approach to late intervention in hydroelectric proceedings, if doing so will not delay the proceeding or result in prejudice to other parties. In such cases, the Commission often has made no finding of whether the movant has demonstrated good cause for the late request." *Id.* ¶ 61276.[3] *Alaska Power & Telephone* establishes that in hydroelectric cases, the Commission in practice does not impose a good cause requirement on late intervention when there is no risk of prej-

---

[3]The Commission denied the late intervention request because it had already issued a dispositive final order, after which "extraordinary grounds" must be present to allow for late intervention because "the prejudice to other parties and burden on the Commission of granting late intervention can be substantial." *Alaska Power and Tel.*, 98 F.E.R.C. ¶ 61277. By contrast, here the Commission has not issued a final order, and no prejudice would result from allowing late intervention.

udice. This case is also a hydroelectric case,[4] but here the Commission without explanation departs from its "liberal approach to late intervention in hydroelectric proceedings" by imposing a rigorous "good cause" requirement on Petitioners despite the lack of prejudice that would result from late intervention. 98 F.E.R.C. at ¶ 61276.

The cases cited by the majority further support the conclusion that the Commission regularly does not require a meaningful showing of good cause for late intervention when there is no prejudice. *See* Op. at 9192-93. The majority asserts that the liberal intervention policy announced in *Cameron LNG, LLC*, 118 F.E.R.C. ¶ 61,019 (2007), and *Columbia Gas Transmission Corp.*, 113 F.E.R.C. ¶ 61,118, 61,438 (2005), is limited only to natural gas cases. However, not only does *Alaska Power & Telephone* apply this policy to hydroelectric cases, but the Commission justifies its liberal late intervention policy in cases involving natural gas not because of anything specific to natural gas, but because "late intervention at the early stages of natural gas certificate proceedings will neither disrupt the proceedings nor prejudice the interests of any other party." *Bradwood Landing LLC NorthernStar Energy LLC*, 126 F.E.R.C. ¶ 61035 (2009).

*Public Utility District No. 1 of Okanogan County*, 63 F.E.R.C. ¶ 61,337, 63,202 (1993), which is not a natural gas case, further undercuts the Commission's decision against Petitioners because there too the Commission allowed a late intervention after determining that it would not disrupt proceedings or cause prejudice. The majority acknowledges that in *Public Utility District* the Commission did not explicitly impose a separate good cause requirement. The most natural reading of *Public Utility District*, *Alaska Power & Telephone*,

---

[4]This case concerns water flow through a dam and involves a license issued under the Federal Power Act. Such licenses permit the operation of dams and other hydroelectric projects. *See* 16 U.S.C. § 797(e); Op. at 9174.

and the natural gas cases, one that unifies them into a consistent standard, is that the Commission does not require any substantial showing of good cause when there is no evidence of prejudice or disruption.[5]

I conclude that the Commission should have allowed Petitioners to intervene both because good cause was shown for a late intervention, and because intervention was permissible in any event under the Commission's usual policy of dispensing with the good cause requirement when, as here, there was no risk of prejudice or disruption to other parties. Here, however, the Commission without explanation departed from its own precedent and required Petitioners to make a substantial showing of good cause. This deviation was an arbitrary departure from prior agency rules of decision and is prohibited by our precedent. *See Cal. Trucking Ass'n v. Interstate Commerce Comm'n*, 900 F.2d 208, 212 (9th Cir. 1990) (stating that an agency "may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case" (quotation omitted)). By denying Petitioners' attempt to intervene, the Commission has ensured that no

---

[5]The majority contends that the Commission "has steadfastly and consistently held" that a petitioner who intervenes late despite having notice that might justify an earlier intervention lacks good cause. Op. at 9195. However, in each of the six cases the majority cites for this claim, the Commission also determined that late intervention would cause prejudice or that another party already represented the late petitioner's interests. *See, e.g.*, *Bradwood Landing LLC*, 126 F.E.R.C. ¶ 61,035 (2009) ("Allowing late intervention at this point in the proceeding brings very little benefit to the proceeding and potentially would create prejudice and additional burdens on the Commission, other parties, and the applicants."); *Cent. Neb. Pub. Power & Irrigation Dist.*, 125 F.E.R.C. ¶ 61,192 (2008) (denying intervention after the Commission issued a dispositive order because "[o]nce a dispositive order has been issued in a proceeding . . . the prejudice to other parties and the burden on the Commission of granting late intervention are substantial"); *Crown Landing LLC*, 117 F.E.R.C. ¶ 61,209 (2006) ( "[Late Petitioner] claims no intention to inject any new argument into this proceeding beyond those offered by [an existing party].").

group can challenge in court whether the Commission's actions in this case comply with federal environmental law. There is no good reason why those who wish to advance important environmental issues should be practically silenced, in the sense that they have submitted materials for the agency to review but are left with no court process for an appeal of the decision of the Commission. I respectfully dissent and would hold that the Commission acted in an arbitrary and capricious manner by failing to follow its own precedent.